UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILMINGTON SAVINGS FUND SOCIETY, FSB, in its capacity as Indenture Trustee and not in its Individual Capacity,<br><br>                    Plaintiff,<br><br>          v.<br><br>CASH AMERICA INTERNATIONAL, INC., a Texas corporation,<br><br>                    Defendant. | No.<br><br>**COMPLAINT** |

Plaintiff, by its attorneys, for its complaint, alleges on its own knowledge or otherwise on information and belief:

## NATURE OF THE ACTION

1.      This action is for breach of contract, in which plaintiff, as trustee, seeks declaratory relief and specific performance of the obligations that defendant issuer wrongfully denied the noteholder beneficiaries of the trustee's contract.

2.      The contract is an indenture, a written agreement between the issuer of debt instruments – that is, the borrower – and a trustee acting for those who buy the debt instruments, lenders typically known as noteholders.  Among other things, indentures contain the promises that the issuer makes to its noteholders which restrict or limit the issuer/borrower from engaging in certain transactions that may impact the issuer's ability to repay the money borrowed from the noteholders or otherwise alter the issuer.  Here, the issuer/borrower and its affiliates disregarded these restrictions and protections in ways

fundamental to the market for high-yield bonds, for which the trustee, as representative of the noteholders/lenders, now asks redress.

3.      The issuer-Defendant is a company called Cash America International, Inc. ("Cash America" and, together with its subsidiaries and affiliates, the "Company"), a Texas public company that provides lending services to individuals online and through its retail locations, which are primarily pawn shops. In May 2013, Cash America raised $300,000,000 through a private offering to institutional investors of notes (the "Notes") issued pursuant to an Indenture (defined below). At that time, a substantial portion of Cash America's revenue came from the Company's online lending business, which was conducted by a wholly-owned subsidiary of Cash America called Enova International, Inc. ("Enova").

4.      Prior to the issuance of the Notes, in September 2011, the Company filed a Registration Statement on Form S-1 with the Securities and Exchange Commission indicating that it was considering an initial public offering ("IPO") of Enova. An IPO is a specialized transaction whereby shares of an entity are offered for sale to the public in accordance with the securities laws. In July 2012, the Company "pulled" the Form S-1 and indicated in a public release it would not then continue to pursue the IPO as a result of "volatility in the IPO market." However, upon issuance of the Notes in May 2013, the Company once again signaled the possibility of an Enova IPO by including an exception to the general prohibition on dispositions of Company assets in the form of a provision in the Indenture that permits an Enova IPO in certain circumstances.

5.      Notwithstanding the inclusion of the Enova IPO provision in the Indenture, the Company did not appear to pursue an IPO of Enova after the issuance of the

Notes.  Instead, shortly after the Note issuance, the Company began pursuing a spin-off of Enova in lieu of a permitted IPO.  The spin-off of Enova was designed to transfer Enova and its assets out of the Company and into a separate and independent company, which was ultimately effected through a distribution to Cash America's shareholders of 80 percent of the shares in Enova.  The Company received no consideration for this distribution of Enova. The noteholders received nothing in connection with the transaction.

6.  Severing the online lending business from Cash America fundamentally diminished the assets and structure of the Company to which the noteholders lent, depriving them of their bargained-for investment.  The Company has effectively siphoned that value to Cash America's equity holders by-passing the noteholders in violation of the Indenture.

7.  To protect noteholders from this very type of harm, the Indenture's Disposition Covenant (defined below) forbids the issuer from selling or disposing of assets unless the transaction qualifies as one of the three types of permitted asset dispositions under the Indenture.  Although one of these permitted dispositions specifically addresses the sale or disposition of Enova and requires such a disposition to meet certain requirements (including in an IPO), Cash America chose to ignore these requirements and dispose of Enova in a different, unpermitted way.

8.  This disposition was improper.  The form of this transaction served one purpose:  to deny the noteholders their due under the Indenture.  Cash America determined not to take the proper steps necessary to redeem the Notes, as they were free to do, pursuant to the Indenture and instead, through a transaction in breach of the Disposition Covenant, violated the Indenture.  These actions resulted in an immediate event of default

occurring and continuing under the Disposition Covenant.  If allowed to stand unremedied, the transaction would be a summons to trickery in, and seriously undermine the integrity of, the leveraged financial markets by allowing companies willfully to avoid the protections provided to noteholders under a standard covenant.

9.      If an issuer wants to effect a corporate transaction that would otherwise violate the agreements governing its debt, it must either first repay those debts under the terms of the governing indentures or obtain waivers or amendments to the agreements by which the noteholders consent to the transaction.  Cash America did neither. The proper way in which defendant could have completed the transaction, in which at least $608 million of assets were improperly transferred to Cash America's equity-holders, would have been by redeeming the bonds.  That is, the Company could have paid the noteholders the benefit of the bargain they made pursuant to the so-called make-whole redemption provision of the Indenture, which compensates noteholders for the loss of future interest income that the issuer promised them by paying them the anticipated income stream discounted to present value.  This was the protection for which the noteholders bargained but which the defendant here sought to avoid.

10.      Accordingly, plaintiff seeks a judicial declaration that defendant's transaction is unlawful under the controlling law of this jurisdiction and in violation of the Indenture, and that, as a result, plaintiff is entitled to specific performance of the make-whole redemption provision of the Indenture.

**THE PARTIES**

11.      Plaintiff Wilmington Savings Fund Society, FSB (the "Trustee") is a Delaware banking and trust company with its principal place of business in Wilmington,

Delaware.   Defendant Cash America International, Inc. ("Cash America") is a Texas

corporation with its principal place of business in Texas.  Cash America is the issuer of $300

million in aggregate principal amount of the 5.75% Senior Notes Due 2018 (the "Notes" and

holders thereof, the "Noteholders"), issued pursuant to the Indenture, dated as of May 15,

2013 (as amended, supplemented or otherwise modified from time to time, the "Indenture"),

by and among, Cash America, the guarantors party thereto, and Wilmington Savings Fund

Society, FSB, as Trustee (Exhibit A).

## JURISDICTION AND VENUE

12.     Jurisdiction over the subject matter is based on 28 U.S.C. § 1332.

This action is between citizens or subjects of a foreign state, and involves an amount-in-

controversy that exceeds the sum or value of $75,000.

13.     Venue is proper in this judicial district under 28 U.S.C. § 1391

because Cash America is subject to personal jurisdiction in this district.  Cash America was

required under the Indenture to maintain an office or agency in New York, and Cash

America interfered with a contract governed by New York law.

## FACTUAL BACKGROUND

### A.     Defendant's Illegal Transaction

14.     On October 22, 2014, Cash America issued a press release

announcing that its Board of Directors had approved a spin-off of its wholly owned

subsidiary Enova into an independent and separate publically traded company.  According to

public filings, the spin-off was effectuated on November 13, 2014 through a distribution of

80 percent of the outstanding shares of Enova to Cash America's shareholders.

15.     The transaction described above (the "Spin-Off" or "Transaction")
was completed without the Notes being redeemed pursuant to Section 3.01 of the Indenture
– the make-whole redemption provision – and without soliciting consents from the
Noteholders, all in violation of the Indenture.

### B.     Event of Default Under the Indenture

16.     By consummating the Transaction, the defendant purposefully
violated Section 5.01 of the Indenture.

17.     Section 5.01 of the Indenture is designed to protect the Noteholders
from exactly the type of transaction that Cash America has undertaken through the Spin-Off.
This Section broadly prohibits asset dispositions by the Company unless the disposition
qualifies as one of the three permitted dispositions listed in Section 5.01(2)(i)-(iii) of the
Indenture.  Specifically, it provides in pertinent part:

> Section 5.01. *Consolidation, Merger or Sale of Assets by the Company.* The
> Company will not, and will not permit any of its Subsidiaries to, dissolve or
> liquidate or consolidate or merge with, or sell, assign, convey, exchange,
> lease or otherwise dispose of its properties to, any other Person except that:
>
> […]
>
> (2) the Company may and may permit any of its Subsidiaries to sell, assign,
> convey, exchange, lease or otherwise dispose of its properties (including,
> without limitation, capital stock, accounts receivable and pawn loans) (each a
> "**Disposition**") to, any Person if:
>
>> (i) such Disposition is in the ordinary course of business;
>>
>> (ii) such Disposition constitutes the Enova Disposition and cash equal
>> to 100% of the Net Proceeds Amount with respect to such Disposition
>> is applied to a Debt Prepayment Application in accordance with
>> paragraph (3) below; or
>>
>> (iii) such Disposition does not constitute the Enova Disposition and
>> the aggregate book value of the properties disposed of by the
>> Company and its Subsidiaries during the 12 month period then most
>> recently ended (other than pursuant to the Enova Disposition) does

not exceed an amount equal to the lesser of (x) 17.5% of Consolidated Total Assets as of the end of the then most recently ended fiscal quarter of the Company or (y) the amount of the asset disposition permission then in effect and set forth in Section 6.5(e) of the Existing Bank Loan Agreement (or the lowest amount set forth in any similar provision if said Section 6.5(e) shall have been amended after March 30, 2011) or the lowest amount set forth in any similar provision in any bank credit facility or bank credit facilities that refinance or replace the Existing Bank Loan Agreement (as in effect from time to time the "**Disposition Limit**"); *provided* that the Company and its Subsidiaries may dispose of properties (other than pursuant to the Enova Disposition) notwithstanding this clause (iii) if cash equal to any portion of the Net Proceeds Amount with respect to such Disposition that exceeds the Disposition Limit then in effect (A) is applied to the acquisition of other property of a similar nature of at least equivalent fair market value within 365 days after such Disposition and/or (B) is applied to a Debt Prepayment Application in respect of such Disposition in accordance with paragraph (3) below;

….

Indenture § 5.01(2)(i)-(iii).  Pursuant to this Section, a disposition is permitted only if it: (i) is completed in the ordinary course of business; (ii) qualifies as the "Enova Disposition" (as that term is defined in the Indenture); or (iii) if it is not the "Enova Disposition," disposes of no more than 10 percent of the Company's Consolidated Total Assets.

18.    The Enova Spin-Off is a disposition of Company property but does not qualify as any of these three permitted dispositions:

(a)    The Transaction is not an ordinary course transaction under 5.01(2)(i).

(b)    The Spin-Off does not qualify as an "Enova Disposition," which the Indenture defines for purposes of exception to be an "initial public offering" or a "sale."  In contrast, the Spin-Off was a distribution of stock to the Company's shareholders which generated no cash proceeds for the Company.

(c)      And based on the Company's most recent public filings, the

Enova stock transferred under the Spin-Off far exceeds the cap on asset

dispositions imposed by 5.01(2)(iii) (the "Disposition Limit").      The

Disposition Limit prohibits the Company or its subsidiaries from disposing of

assets in a 12-month period whose value exceeds the lesser of: (x) 17.5% of

the Company's Consolidated Total Assets or (y) the ceiling for permitted

asset dispositions under the Company's bank credit facility, which is 10% of

Consolidated Total Assets,  see Credit Agreement, dated March 30, 2011 (as

amended, supplemented or otherwise modified from time to time, "Existing

Bank Loan Agreement"), by and among Cash America, the guarantors party

thereto, the lenders party thereto and Wells Fargo N.A., as administrative

agent § 6.5(e) (Exhibit B).  As of September 30, 2014, Cash America listed

total assets of $2,100,345,000 (equivalent to the Company's "Consolidated

Total Assets") and at that time Enova's most recent public reporting listed

total assets of $760,438,000.  Based on these figures, a spin-off of 80% of

Enova's stock would represent $608,350,400 of Enova's book value and

approximately 29% of Cash America's Consolidated Total Assets, thus

exceeding the Disposition Limit.

19.      Consequently, the Company violated Section 5.01 of the Indenture.

Pursuant to Section 6.01(3) of the Indenture, failure by the Company to comply with its

obligations under Section 5.01 of the Indenture constitutes an immediate Event of Default.

Upon an Event of Default, Section 6.02(a) of the Indenture states: "the Trustee or the

Holders of at least 25% in aggregate principal amount of the Notes then outstanding, by

written notice to the Company (and to the Trustee if notice is given by the Holders), may,

and the Trustee at the request of such Holders shall, declare the principal of and accrued

interest on the Notes to be immediately due and payable."

20.    Furthermore, Section 6.03 of the Indenture allows the Trustee to

pursue any other available remedies and provides as follows:

> If an Event of Default occurs and is continuing, the Trustee may pursue, in its
> own name or as trustee of an express trust, any available remedy by
> proceeding at law or in equity to collect the payment of principal of and
> interest on the Notes or to enforce the performance of any provision of the
> Notes or the Indenture.

Indenture § 6.03.

### C.    The Noteholders' Letters and Notices of Default

21.    On or about October 28, 2014, a group of Noteholders holding at least

twenty-five percent of the Notes entitled to vote under the Indenture sent a letter to Cash

America, stating, in relevant part, that the proposed Spin-Off would violate Section 5.01 of

the Indenture (the "Disposition Covenant").   By letter dated November 3, 2014, Cash

America denied the violation of the Indenture asserted by the Noteholders.   Subsequently,

the Noteholders exchanged further correspondence with the defendant regarding the

violations of the Indenture and the resulting Event of Default in an attempt to reach a

mutually acceptable outcome to no avail.

### D.    The Make-Whole Redemption

22.    It is a fundamental tenet of any debt agreement that, if an issuer wants

to effect a corporate transaction that would otherwise violate the agreements governing its

debt, it must first repay its debt or obtain waivers or amendments to those agreements.  The

proper way in which defendant could have completed the Transaction, in which at least $608

million of assets were improperly transferred to Cash America's equityholders, would have

been by redeeming the Notes pursuant to Section 3.01 of the Indenture.  Section 3.01 of the

Indenture allows Cash America to redeem the Notes using the make-whole redemption,

which calculated as of the date of Spin-Off was 113.65% of the principal amount of the

Notes, plus accrued and unpaid interest.  The purpose of the make-whole provision is to

compensate Noteholders for the loss of future interest income that the issuer promised them

by paying them the anticipated income stream over time discounted to present value.  This

was the protection that the Noteholders bargained for but which the defendant sought to

avoid.

           23.     Because the defendant willfully caused an Event of Default which

would allow the Trustee or Noteholders to declare that the Notes become due and payable

prior to the maturity date, plaintiff's appropriate remedy is for the defendant to redeem the

Notes using the make-whole redemption in Section 3.01 of the Indenture calculated as of the

Spin-Off.  So teaches *Sharon Steel Corp.* v. *Chase Manhattan Bank,* 691 F.2d 1039 (2d Cir.

1982), in which the Court of Appeals for the Second Circuit found that the indenture trustee

was entitled to seek specific performance (in lieu of acceleration) on behalf of the

bondholders to compel the issuer to redeem the bonds and pay the make-whole premium

because the issuer willfully caused a violation of the indenture.  Here, as in *Sharon Steel*, the

"acceleration provisions of the [I]ndentures are explicitly permissive and not exclusive of

other remedies" and, just as in *Sharon Steel*, this is not a case in which the defendant is

unable to make the required payments.  *Id.* at 1053.  The defaults here directly resulted from

defendant's willful circumvention of the terms of the Indenture instead of properly

redeeming the Notes under Section 3.01 thereof.

## FIRST CLAIM FOR RELIEF
### (Declaratory Relief)

24.     Plaintiff repeats the prior allegations of this complaint as if the same were made part of and fully set forth at length herein.

25.     The Indenture is a valid and enforceable contract to which defendant Cash America and Plaintiff are parties and the Noteholders are third party beneficiaries.

26.     The Disposition Covenant prohibited Cash America from, among other things, disposing of Enova or any assets in accordance with the rules proscribed by 5.01.

27.     The Transaction described above violated Section 5.01 of the Indenture, resulting in an immediate Event of Default pursuant to Section 6.01(3) of the Indenture.

28.     Plaintiff has duly given the defendant notice of the Event of Default pursuant to and in accordance with the terms of the Indenture.

29.     Defendant has denied that the violation under the Indenture has occurred and is continuing as a result of the Transaction.

30.     By virtue of the foregoing, an actual controversy exists among plaintiff and defendant.

31.     Plaintiff is entitled to a judgment declaring the Transaction is unlawful and in violation of the Indenture.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract and Action for Specific Performance)

32.     Plaintiff repeats the prior allegations of this complaint as if the same were made part of and fully set forth at length herein.

11

33.     The Indenture is a valid and enforceable contract to which defendant Cash America and Plaintiff are parties and the Noteholders are third party beneficiaries.  The Trustee and the Noteholders have fully performed their respective obligations under the Indenture.

34.     Plaintiff is entitled to specific performance of the make-whole redemption provisions of the Indenture because defendant caused an Event of Default which would allow the Trustee to declare the Notes to become due and payable before the date of maturity by willful consummation of the Transaction, in violation of the Indenture.

35.     Plaintiff has no adequate remedy at law to enforce the provisions of the Indenture other than specific enforcement of the make-whole redemption provisions.

36.     As a direct result of defendant's willful breach of its contractual covenant under the Indenture, Plaintiff, on behalf of the Noteholders, is entitled to actual damages equal to the make-whole redemption amounts, calculated pursuant to Section 3.01 of each of the Indenture, as of the date of the Spin-Off, of not less than 113.65% of the principal amount of the Notes, plus accrued and unpaid interest, including default interest, plus all fees, costs and expenses incurred in enforcing its rights to these amounts.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against the defendant as follows:

(a)     declaring that an Event of Default under Section 5.01 of the Indenture has occurred and is continuing as a result of the Transaction;

(b)      decreeing that defendant shall compensate Plaintiff, on behalf of the

Noteholders, in an amount of not less than the make-whole redemption amounts pursuant to

Section 3.01 of the Indenture, calculated as of the date of Spin-Off, or not less than 113.65%

of the principal amount of the Notes, plus accrued and unpaid interest, including default

interest, plus all fees, costs and expenses incurred in enforcing their rights to these amounts;

(c)      awarding Plaintiff its reasonable attorneys' fees and costs; and

(d)      granting such other and further relief as the Court may deem just and

proper.

DATED:   New York, New York         PAUL, WEISS, RIFKIND, WHARTON &
           June 26, 2015               GARRISON LLP
                                            Attorneys for Plaintiff


By:        /s/ Gerard E. Harper
        Gerard E. Harper
        Andrew N. Rosenberg
        1285 Avenue of the Americas
        New York, NY 10019-6064
        (212) 373-3000
        gharper@paulweiss.com
        arosenberg@paulweiss.com

14