UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILMINGTON SAVINGS FUND SOCIETY, FSB, in its capacity as Indenture Trustee and not in its Individual Capacity,<br><br>                Plaintiff,<br><br>      v.<br><br>CASH AMERICA INTERNATIONAL, INC., a Texas corporation,<br><br>                Defendant. | No. 15 Civ. 5027 (JMF) |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Walter Rieman
Andrew N. Rosenberg
Karen R. King
Michael S. Rudnick
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: 212-373-3000
Facsimile:  212-757-3990

*Attorneys for Plaintiff*

**Table of Contents**

|  |  | **Page** |
|---|---|---|
| Table of Authorities | | ii |
| Glossary and Citation Conventions | | iv |
| Preliminary Statement | | 1 |
| Statement of Facts | | 3 |
| | A. The Indenture | 3 |
| | B. The Spin-Off | 6 |
| Legal Standard | | 8 |
| Argument | | 9 |
| I. | By Executing the Spin-Off, Cash America Breached the Prohibition on Dispositions of Cash America's Property in Section 5.01 of the Indenture | 9 |
| | A. The Spin-Off Was a Prohibited Disposition of Property | 9 |
| | B. None of the Exceptions in the Indenture to the Prohibition on Property Dispositions Applies Here | 11 |
| II. | The Proper Remedy for Cash America's Breach Is an Award of the Redemption Price for the Notes | 12 |
| Conclusion | | 18 |

**Table of Authorities**

**Page(s)**

**Cases**

*Bank of N.Y. Tr. N.A.* v. *Franklin Advisers, Inc.*,
726 F.3d 269 (2d Cir. 2013)................................................................................................9

*Bi-Economy Mkt., Inc.* v. *Harleysville Ins. Co. of N.Y.*,
886 N.E.2d 127 (N.Y. 2008)..............................................................................................17

*In re Chemtura Corp.*,
439 B.R. 561 (Bankr. S.D.N.Y. 2010)...............................................................................13

*Chesapeake Energy Corp.* v. *Bank of N.Y. Mellon Trust Co., N.A.*,
No. 13 Civ. 1582 (PAE), 2015 WL 4191419 (S.D.N.Y. July 10, 2015) ...................................9

*Clearview Concrete Prods. Corp.* v. *S. Charles Cherardi*,
453 N.Y.S.2d 750 (App. Div. 2d Dep't 1982) ............................................................17

*In re Granite Broad. Corp.*,
369 B.R. 120 (Bankr. S.D.N.Y. 2007)................................................................................17

*Jamie Sec. Co.* v. *Ltd., Inc.*,
880 F.2d 1572 (2d Cir. 1989)..............................................................................................9

*John Wiley & Sons, Inc.* v. *Book Dog Books, LLC*,
No. 13 Civ. 816 (WHP) (GWG), 2015 WL 4154112 (S.D.N.Y. July 10, 2015)......................8

*In re MPM Silicones, LLC*,
No. 14-22503-RDD, 2014 WL 4436335 (Bankr. S.D.N.Y. Sept. 9, 2014),
*aff'd*, 531 B.R. 321 (S.D.N.Y. 2015) .................................................................13, 17

*Quadrant Structured Prods. Co., Ltd.* v. *Vertin*,
16 N.E.3d 1165 (N.Y. 2014)................................................................................................9

*Reyes* v. *Metromedia Software, Inc.*,
840 F. Supp. 2d 752 (S.D.N.Y. 2012)................................................................................9

*Sharon Steel Corp.* v. *Chase Manhattan Bank, N.A.*,
521 F. Supp. 118 (S.D.N.Y. 1981),
*aff'd in part and rev'd in part*, 691 F.2d 1039 (2d Cir. 1982) ................................................16

*Sharon Steel Corp.* v. *Chase Manhattan Bank, N.A.*,
691 F.2d 1039 (2d Cir. 1982)........................................................................ *passim*

*Vill. of Piermont* v. *Am. Alternative Ins. Corp.*,
No. CV 14 5172 (ER), 2015 WL 9302830 (S.D.N.Y. Dec. 17, 2015) ....................................9

**Rule**

Fed. R. Civ. P. 56(a) ...............................................................................................................8

**Other Authorities**

*Black's Law Dictionary* (10th ed. 2014)..................................................................................10

Scott K. Charles & Emil A. Kleinhaus, *Prepayment Clauses in Bankruptcy*,
    15 Am. Bankr. Inst. L. Rev. 537 (2007) ......................................................13, 16, 17

E. Allen Farnsworth, *Legal Remedies for Breach of Contract*,
    70 Colum. L. Rev. 1145 (1970) .................................................................................18

Stephen I. Glover, *Business Separation Transactions:*
    *Spin-Offs, Subsidiary IPOs, and Tracking Stock* (2015) ...........................................7

Restatement (Second) of Contracts (1981) ..........................................................................17

**Glossary and Citation Conventions**

This brief uses the following defined terms:

**"Cash America"** means defendant Cash America International, Inc.

**"Enova"** means Enova International, Inc.

**"Indenture"** means the indenture dated May 15, 2013, between Cash America, various guarantors, and Wells Fargo Bank, National Association as indenture trustee.

**"Noteholder"** means a holder of the Notes.

**"Notes"** means the 5.750% Senior Notes due 2018 issued by Cash America pursuant to the Indenture.

**"Spin-Off"** means the transaction on November 13, 2014, in which Cash America conveyed 80% of the shares of Enova through a stock dividend to Cash America's shareholders.

**"Trustee"** means plaintiff Wilmington Savings Fund Society, FSB.

Citations in the form "Rieman Ex.__" refer to exhibits to the accompanying Declaration of Walter Rieman dated January 29, 2016.

Citations in the form "56.1 ¶ __" refer to the Local Rule 56.1 Statement of Undisputed Material Facts in Support of Plaintiff's Motion for Summary Judgment.

**Preliminary Statement**

Plaintiff Trustee, acting on behalf of Noteholders, seeks redress for a breach by Cash America of the Indenture governing the Notes.  Under Section 5.01 of the Indenture, Cash America agreed not to "dissolve or liquidate or consolidate or merge with, or sell, assign, convey, exchange, lease or otherwise dispose of its properties."  (Rieman Ex. 1, at § 5.01.)  In violation of this provision, Cash America disposed of 80% of the shares of a valuable wholly owned subsidiary to its shareholders through a stock dividend.  Neither Cash America nor the Noteholders received any compensation in connection with that Spin-Off.  The Spin-Off disposed of significant property, reduced Cash America's future expected income, and fundamentally changed its financial condition.  Moreover, the Spin-Off was manifestly a breach of the Indenture.

Under the Indenture and the decisional law of the Second Circuit, the proper remedy for Cash America's breach is an award requiring Cash America to redeem the Notes by paying the redemption price, calculated in accordance with the Indenture. Cash America could have completed the Spin-Off by redeeming the Notes through payment of the redemption price in accordance with Section 3.01 of the Indenture.  The redemption price is calculated pursuant to a formula in the Indenture that comprises unpaid principal, unpaid interest, and an amount sufficient to compensate holders for the loss of their expected future yield.  Such indenture provisions, which are typical, are known as "make-whole" provisions.

Cash America, however, elected *not* to redeem the Notes before executing the Spin-Off.  Instead, Cash America tried to complete the Spin-Off in violation of the Indenture by leaving the Notes outstanding.  After the Spin-Off, the Noteholders were left holding Notes that, as an economic and legal matter, did not conform to the securities described in the Indenture.  In substance, the Spin-Off deprived the Noteholders of the securities that they had agreed to

1

purchase and own, and attempted to force on them new indenture terms that permit Cash America to give away its property to its shareholders. Neither the Indenture nor the law of this Circuit permits a one-sided re-writing of the Indenture.

The Second Circuit's decision in *Sharon Steel Corp.* v. *Chase Manhattan Bank, N.A.*, 691 F.2d 1039 (2d Cir. 1982), dictates that the proper remedy for Cash America's breach is an award equal to the make-whole redemption price for the Notes. The Noteholders are entitled to the benefit of their bargain and are not limited, as Cash America suggests, to payment of principal plus accrued interest as if the Trustee had accelerated the Notes. Under *Sharon Steel*, if Cash America wanted to engage in a prohibited transaction, it was required to redeem the Notes by paying the make-whole amount or to obtain the consent of the Noteholders.

In *Sharon Steel*, as here, an issuer of bonds breached the terms of an indenture by disposing of assets. In *Sharon Steel*, as here, those asset dispositions changed the economic characteristics of the bonds that the bondholders had agreed to own. And in *Sharon Steel*, as here, the breaching issuer argued that the bondholders' remedy was limited to the amount that would have been owed if the bonds had been accelerated. The district court in *Sharon Steel*, which accepted that argument, concluded "that [the issuer] defaulted under the indenture agreement and that the default provisions provide for acceleration rather than a redemption premium." *Id.* at 1053.

But Judge Winter, writing for a unanimous panel in *Sharon Steel*, declared that "[w]e do not agree." *Id.* As the Second Circuit explained:

> The acceleration provisions of the indentures are explicitly permissive and not exclusive of other remedies. We see no bar, therefore, to the Indenture Trustees seeking specific performance of the redemption provisions where the debtor causes the debentures to become due and payable by its voluntary actions.
>
> This is not a case in which a debtor finds itself unable to

2

make required payments. . . . ***We hold, therefore, that the redemption premium must be paid.***

*Id*. (emphasis added).

The holding and reasoning of *Sharon Steel* require that here, too, "the redemption premium must be paid." Cash America did not fully liquidate itself by disposing of all of its property, as the defaulting debtor did in *Sharon Steel*, but Cash America did purposefully dispose of material property in clear breach of the Indenture. Governing law in this Circuit provides that an issuer of bonds cannot avoid the payment of a redemption price by voluntarily entering into a transaction that breaches the indenture, and then arguing that the bondholders' sole remedy is acceleration. To the contrary, *Sharon Steel* dictates that in these circumstances, the issuer must pay the agreed-upon redemption price. The bondholders are entitled to be placed in the same position they would have been in if the issuer had complied with the indenture, and the issuer cannot be put in a better place by breaching its agreement than by complying with it.

Accordingly, the Court should award summary judgment finding that by executing the Spin-Off, Cash America breached the Indenture. The Court should further award the Trustee, for distribution to the Noteholders, an amount equal to the redemption price for the Notes on the date of the Spin-Off plus interest. Under Section 6.12 of the Indenture, the Trustee is also entitled to all fees, costs, and expenses incurred by the Trustee in enforcing the rights of the Noteholders under the Indenture.

<strong>Statement of Facts</strong>

**A.    The Indenture**

Cash America, a publicly traded company with its principal place of business in Texas, has been in the business of providing secured non-recourse lending to customers since 1984. (56.1 ¶¶ 1–2.) On May 15, 2013, Cash America issued $300 million in principal amount

3

of Notes pursuant to the Indenture.  (Rieman Ex. 1, at 8.)[1]  The principal amount of the Notes accrued interest at a rate of 5.75% per annum, and the Notes had a stated maturity of May 15, 2018.  (Rieman Ex. 1, at § 1.01, at 25 (defining stated maturity); Rieman Ex. 1, at Ex. A, at A-1, A-4.)  The Indenture is governed by New York law.  (Rieman Ex. 1, at § 11.07.)

Section 5.01 of the Indenture broadly prohibits dispositions of property by Cash America:

> The Company will not, and will not permit any of its Subsidiaries to, dissolve or liquidate or consolidate or merge with, or sell, assign, convey, exchange, lease or otherwise dispose of its properties to, any other Person . . . .

(Rieman Ex. 1, at § 5.01.)  There are three circumstances when the prohibition does not apply:  if the disposition (i) is completed in the ordinary course of business; (ii) qualifies as the "Enova Disposition," which is limited to an initial public offering of Enova's shares that is structured in a specified way; or (iii) disposes of no more than 10% of Cash America's Consolidated Total Assets.[2]  (Rieman Ex. 1, at § 5.01(2)(i)–(iii).)  As explained below, Cash America concedes that the Enova Spin-Off does not fall within the first or second of these exceptions.  Cash America's argument that the third exception applies is incorrect, as the Indenture and Cash America's own

---

[1]    Wells Fargo Bank, N.A. was the original trustee.  (56.1 ¶ 5.)  In March 2015, Wilmington Savings Fund Society, FSB became the successor trustee.  (56.1 ¶ 7.)

[2]    The documents establish the 10% threshold in the following way.  Section 5.01(2)(iii) of the Indenture defines the maximum permitted disposition as the lesser of two amounts, subject to a "notwithstanding" clause that is irrelevant here.  In fact, the lesser of the two amounts was "the amount of the asset disposition permission then in effect and set forth in Section 6.5(e) of the Existing Bank Loan Agreement."  (Rieman Ex. 1, at § 5.01(2)(iii).)  Section 6.5(e) of the Existing Bank Loan Agreement, in turn, established a disposition permission of 10% of Cash America's Consolidated Total Assets as of the last day of the immediately preceding fiscal year.  (Rieman Ex. 2, at § 6.5(e), Ex. 3, at 4; *see* Rieman Ex. 1, at § 1.01, at 13 (defining Existing Bank Loan Agreement).)

4

public filings clearly establish that the value of the property spun off exceeded the 10% threshold.

Under Section 3.01 of the Indenture, Cash America may redeem the Notes by paying a "redemption price" calculated pursuant to a formula stated in Section 3.01. (Rieman Ex. 1, at § 3.01.) The redemption price includes unpaid principal, unpaid interest, and an amount sufficient to compensate Noteholders for the loss of their expected future yield.[3] Inclusion of the make-whole redemption option provided Cash America with flexibility that it would not have had if the Indenture had required Cash America to leave the Notes and their covenants outstanding until the stated maturity. Following exercise of the make-whole redemption option, Cash America would no longer be required to comply with the terms of the Indenture, including the prohibition on the disposition of property. (Rieman Ex. 1, at § 8.01(a)(2)(A).) But absent redemption, the Notes and their covenants stand.

Section 6.01 of the Indenture provides that an Event of Default occurs if Cash America fails to comply with certain obligations under the Indenture, including Cash America's obligation not to engage in prohibited dispositions of property. (Rieman Ex. 1, at § 6.01.) If an

---

[3]   The redemption price is:

> the greater of the following amounts: (x) 100% of the principal amount of the Notes being redeemed on the redemption date; and (y) the sum of the present values of the remaining scheduled payments of principal and interest on the Notes being redeemed on that redemption date (not including the amount of accrued and unpaid interest to, but excluding, the redemption date) discounted to the redemption date on a semi-annual basis at the Treasury Rate, as determined by the Reference Treasury Dealer, plus 50 basis points; plus, in each case, accrued and unpaid interest on the Notes being redeemed to, but excluding, the redemption date.

(Rieman Ex. 1, at § 3.01.) On the facts of this case, the redemption price calculated pursuant to clause (y) is the greater of the two amounts, and is therefore the applicable redemption price. (56.1 ¶ 63.)

Event of Default occurs, Section 6.02(a) authorizes the Trustee, by written notice, to accelerate the Notes and "declare the principal of and accrued interest on the Notes to be immediately due and payable." (Rieman Ex. 1, at § 6.02(a).) This acceleration remedy is permissive; the Trustee has no obligation to accelerate upon the occurrence of an Event of Default. (*See* Rieman Ex. 1, at § 6.02 (stating that the Noteholders and the Trustee *may* declare the Notes due and payable) (emphasis added). The Trustee has not accelerated the Notes. Rather, as permitted by the Indenture, "the Trustee may pursue . . . any available remedy by proceeding at law or in equity to collect the payment of principal of and interest on the Notes or to enforce the performance of any provision of the Notes or the Indenture." (Rieman Ex. 1, at § 6.03.)

**B.      The Spin-Off**

At the time Cash America issued the Notes, Enova was a wholly owned subsidiary of Cash America. (56.1 ¶ 23.) Enova owned a very profitable online lending business. (56.1 ¶ 24.) During the first quarter of 2013, which was the last full quarter before issuance of the Notes, Enova generated 38.94% of Cash America's revenue. (56.1 ¶¶ 25–27.)

In April 2014, Cash America issued a press release announcing that:

> [Cash America's] Board of Directors has authorized management to review potential strategic alternatives, including a tax-free spin-off, for the separation of its online lending business that comprises its e-commerce division, Enova International, Inc. . . . . While a final decision has not been made, a spin-off would create a stand-alone, publicly traded online lending company with approximately $766 million in annual revenue as of December 31, 2013. If a spin-off were to occur, the Company would be separated into two publicly traded companies . . . .

(Rieman Ex. 9.)

A spin-off, as described in Cash America's announcement, refers to a transaction in which:

> the parent company distributes all of the stock of a subsidiary to the parent stockholders in the form of a *pro rata* dividend. After the distribution is completed, the spun-off company is no longer a subsidiary of the parent, and the parent's stockholders hold not only the parent's stock but also the subsidiary's stock. In some deals, rather than distributing all of the subsidiary's stock, the parent distributes only a portion of the stock and retains the balance.

Stephen I. Glover, *Business Separation Transactions: Spin-Offs, Subsidiary IPOs, and Tracking Stock* § 2.02 (2015).

In a report on Form 10-Q filed with the U.S. Securities and Exchange Commission during July 2014, Cash America announced that its management had recommended to its board of directors that Cash America pursue a spin-off of Enova. The relevant portion of Cash America's report explained:

> [M]anagement has recommended that the Company's Board of Directors pursue a tax-free spin-off . . . . If a spin-off occurs, the Company will be separated into two publicly traded companies: Enova International, Inc., which would own and operate the Company's online lending business that comprises its E-Commerce Division (or the e-commerce segment), and Cash America International, Inc., which would own and operate the Company's storefront lending businesses that comprise its Retail Services Division (or the retail services segment).
>
> . . . .
>
> The Company currently expects that any spin-off would be in the form of a tax-free distribution of 80 percent of the Enova common stock to the Company's shareholders.

(Rieman Ex. 6, at 34.)

During October 2014, Cash America issued a press release announcing that "its Board of Directors has approved the spin-off of its E-Commerce Division (that comprises its e-

7

commerce segment), Enova International, Inc. ('Enova'), into an independent and separate publicly traded company." (Rieman Ex. 10.)

Later in October 2014, a Noteholder informed Cash America by letter that the Spin-Off would violate the Indenture, and that the Indenture therefore required Cash America to redeem the Notes and pay the redemption price before the Spin-Off occurred. (*See* Rieman Ex. 11.) Cash America did not redeem the Notes but elected to go forward with plans for the Spin-Off notwithstanding the prohibitions in the Indenture. (56.1 ¶¶ 37–38; *see* Ex. 12.)

The Spin-Off occurred on November 13, 2014. On that date, Cash America conveyed 80% of Enova's shares to Cash America's shareholders through a stock dividend. (56.1 ¶¶ 38–39.) Each Cash America shareholder received 0.915 shares of Enova for every one share of Cash America that the shareholder owned on November 3, 2014 (the record date). (56.1 ¶ 40.) After the Spin-Off, Enova became an independent public company; its common stock is traded on the New York Stock Exchange. (56.1 ¶¶ 46–47.) After the Spin-Off, Enova held, through its subsidiaries, the assets and liabilities formerly associated with Cash America's e-commerce business. (56.1 ¶ 46.)

Cash America received no consideration for its conveyance of Enova shares to Cash America's shareholders. (56.1 ¶ 48.) The Noteholders received no consideration in connection with the Spin-Off. (56.1 ¶ 49.)

**Legal Standard**

Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A motion for summary judgment may be granted in a contract dispute if the contractual language on which the moving party's case rests is found to be unambiguous. *John Wiley & Sons, Inc.* v. *Book Dog Books, LLC*, No. 13 Civ. 816 (WHP) (GWG), 2015 WL

8

4154112, at *4 (S.D.N.Y. July 10, 2015) (citing *Topps Co, Inc.* v. *Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008)).  "A contract is not ambiguous simply because the parties have urged conflicting interpretations."  *Reyes* v. *Metromedia Software, Inc.*, 840 F. Supp. 2d 752, 755 (S.D.N.Y. 2012).  Whether a contract is ambiguous is a question of law to be decided by the court.  *See Vill. of Piermont* v. *Am. Alternative Ins. Corp.*, No. Civ. 14 5172 (ER), 2015 WL 9302830, at *7 (S.D.N.Y. Dec. 17, 2015).

**Argument**

I.    **By Executing the Spin-Off, Cash America Breached the Prohibition on Dispositions of Cash America's Property in Section 5.01 of the Indenture**

   A.    **The Spin-Off Was a Prohibited Disposition of Property**

   The Indenture is a contract between Cash America and the Trustee.  (*See* 56.1 ¶ 3.)  *See, e.g., Chesapeake Energy Corp.* v. *Bank of N.Y. Mellon Trust Co., N.A.*, No. 13 Civ. 1582 (PAE), 2015 WL 4191419, at *11 (S.D.N.Y. July 10, 2015) ("An indenture . . . is a form of contract."); *Quadrant Structured Prods. Co., Ltd.* v. *Vertin*, 16 N.E.3d 1165, 1172 (N.Y. 2014) ("A trust indenture is a contract . . . ") (citing *Sharon Steel Corp.* v. *Chase Manhattan Bank, NA.*, 691 F.2d 1039, 1049 (2d Cir. 1982), and collecting cases).  Indenture provisions are interpreted using principles of ordinary contract law.  *See Bank of N.Y. Tr. N.A.* v. *Franklin Advisers, Inc.*, 726 F.3d 269, 276 (2d Cir. 2013); *Jamie Sec. Co.* v. *Ltd., Inc.*, 880 F.2d 1572, 1576 (2d Cir. 1989).

   The prohibition in the Indenture on dispositions of Cash America's property, with subsequently stated exceptions that do not apply here, is unambiguous:  "The Company will not . . . dissolve or liquidate or consolidate or merge with, or sell, assign, convey, exchange, lease or otherwise dispose of its properties to, any other Person . . . ."  (Rieman Ex. 1, at § 5.01.)  This provision, which uses multiple overlapping verbs followed by "otherwise dispose" as a catch-all

9

verb to guard against the possibility of any misunderstanding or inadvertent gaps, was clearly intended to capture comprehensively all of the ways in which Cash America might divest ownership of its property.

In the Spin-Off, Cash America *conveyed* 80% of Enova's shares to Cash America's shareholders. *See Black's Law Dictionary* 407 (10th ed. 2014) (defining "convey" as "[t]o transfer or deliver (something, such as a right or property) to another"). In the Spin-Off, Cash America *assigned* those Enova shares to Cash America's shareholders. *See Black's Law Dictionary* 142 (10th ed. 2014) (defining "assign" as "[t]o convey in full; to transfer (rights or property)"). And in the Spin-Off, Cash America *disposed* of those Enova shares to Cash America's shareholders. *See Black's Law Dictionary* 572 (10th ed. 2014) (defining "disposition" as "[t]he act of transferring something to another's care of possession, esp. by deed or will; the relinquishing of property"). The Spin-Off was manifestly a breach of the Indenture.

Cash America has suggested that Section 5.01 applies only to "an asset sale for consideration." (Rieman Ex. 12.) Section 5.01, however, is not limited to sales. It separately prohibits any conveyance, assignment, or disposition of assets that otherwise comes within its terms. (Rieman Ex. 1, at § 5.01.) Nor does Section 5.01 require consideration. It would be irrational for the Indenture to prohibit a sale of property *for value*, but not to prohibit a disposition of property for *no value*.

The Indenture defines the term "Person" to mean "an individual, partnership, corporation, limited liability company, association, trust, unincorporated organization, business entity or Governmental Authority." (Rieman Ex. 1, at § 1.01.) The phrase "any other Person" in Section 5.01 covers anyone who is not Cash America. Cash America's shareholders are therefore "Persons." It does not matter that the Spin-Off involved multiple "Persons," because,

10

among other reasons, Section 5.01 is violated by multiple dispositions within a twelve-month period that, when aggregated, exceed the relevant limitation on value. (Rieman Ex. 1, at § 5.01(2)(iii).)

### B. None of the Exceptions in the Indenture to the Prohibition on Property Dispositions Applies Here

Cash America has asserted that even if the Spin-Off was a disposition, it would qualify as a permitted disposition under Section 5.01(2)(iii) of the Indenture. (Rieman Ex. 13.) Cash America apparently argues that the aggregate book value of the Enova stock did not exceed the disposition limit set forth in that section. (*Id*.) This argument is simply and demonstrably wrong. The maximum permitted disposition under Section 5.01(2)(iii), which the Indenture defines as the Disposition Limit, was 10% of Cash America's Consolidated Total Assets as of the last day of the immediately preceding fiscal year. *See supra* p. 4 n.2. In Cash America's audited consolidated financial statements for 2013, which was the fiscal year immediately preceding the Spin-Off, Cash America valued its total assets as of December 31, 2013, at $2,081,784,000. (Rieman Ex. 4, at 154.) The Disposition Limit was therefore 10% of that amount, or $208,178,400.

For purposes of the prohibition on dispositions of property, the book value of Enova's shares "shall be deemed to be the aggregate book value of all assets" of Enova. (Rieman Ex. 1, at § 5.01(7).) Enova's assets had a book value of $760,438,000 as of September 30, 2014. (Rieman Ex. 7.) That is the last valuation available before the Spin-Off. Cash America conveyed 80% of Enova's shares in the Spin-Off, and 80% of the then-stated book value for Enova's assets was $608,350,400. That amount is almost three times the amount of the Disposition Limit.

11

Cash America admits that the other exceptions under Section 5.01(2) do not apply. (*See* 56.1 ¶¶ 51–52.)[4] By negative implication, the exception to the prohibition provided for the specifically defined "Enova Disposition" further demonstrates that the Spin-Off was a prohibited disposition of property. That exception would have allowed Cash America to dispose of its shares of Enova through an initial public offering, provided that 100% of the net proceeds of the offering was applied to the payment of Cash America's senior indebtedness, which included the Notes. (Rieman Ex. 1, at § 1.01, at 12, 24 (defining Enova Disposition and Senior Indebtedness); *id.* at § 5.01(2)(ii).) This limited exception, which is concededly inapplicable here, demonstrates that the Indenture was *not* intended to permit other dispositions of Cash America's shares in Enova.

Because the Spin-Off was a disposition of Cash America's property that did not qualify under any of the exceptions, the Spin-Off breached the Indenture.

## II.    The Proper Remedy for Cash America's Breach Is an Award of the Redemption Price for the Notes

The proper remedy for Cash America's breach is an award equal to the redemption price for the Notes, as calculated under Section 3.01 as of the date of the Spin-Off. Redemption provisions like Section 3.01, which appear in many indentures, are known as

---

[4]    In response to the Trustee's interrogatories, Cash America appears to argue that because the Spin-Off did not produce a Net Proceeds Amount (as defined in the Indenture) in excess of the Disposition Limit (which, as explained above, was $208,178,400), or in fact any consideration to Cash America at all, there is no limitation on the disposition. (*See* Rieman Ex. 13; *see also* Rieman Ex. 12). That interpretation is plainly wrong. Section 5.01(2)(iii) of the Indenture is a limited exception to the general prohibition on dispositions. The exception simply permits certain dispositions of property up to a value limit. If cash equal to the Net Proceeds Amount above the limit (i.e. consideration for the disposition) is applied in the prescribed manner for the benefit of Cash America and its creditors, the Disposition Limit does not apply. The exception does not permit Cash America to dispose of property with book value in excess of the Disposition Limit for no consideration at all in order to evade the limitation preceding the proviso.

"make-whole" provisions.  *See, e.g.*, Scott K. Charles & Emil A. Kleinhaus, *Prepayment Clauses in Bankruptcy*, 15 Am. Bankr. Inst. L. Rev. 537, 544 (2007) ("[A] major category of prepayment fees is composed of fees based on so-called yield maintenance formulas . . . which are sometimes described as 'makewholes.'").  The redemption price, or "make-whole" price, is intended to make the holders of debt securities whole for losses they would otherwise sustain by reason of the issuer's termination of the debt securities prior to the stated maturity date.  *See, e.g., In re MPM Silicones, LLC*, No. 14-22503-RDD, 2014 WL 4436335, at *15 (Bankr. S.D.N.Y. Sept. 9, 2014) (stating that the purpose of a make-whole "is to ensure that the lender is compensated for being paid earlier than the original maturity of the loan for the interest it will not receive"), *aff'd*, 531 B.R. 321 (S.D.N.Y. 2015); *In re Chemtura Corp.*, 439 B.R. 561, 596 (Bankr. S.D.N.Y. 2010) ("Make-whole and no-call provisions in bond indentures protect lenders' right to the yield that was expected at the time that they made their loans.").

If Cash America wished to execute the Spin-Off in a way that adhered to the Indenture, the Indenture provided a clear path.  Cash America should have redeemed the Notes by paying the redemption price under Section 3.01.  Cash America could then have executed the Spin-Off without breaching the Indenture.

Instead, Cash America breached the Agreement by knowingly proceeding with the Spin-Off while the Notes remained outstanding and the Indenture remained in force and binding.  Cash America now argues that the Trustee's remedy is limited to acceleration of the Notes.  If the Trustee accelerated the Notes, however, Cash America would be required to pay only the principal and accrued but unpaid interest.  In that event, Cash America would not be required to pay the amount included in the redemption price that is intended to compensate Noteholders for the loss of their expected future yield.  In other words, by attempting to limit the

13

Trustee to the remedy of acceleration, Cash America seeks to place itself in a better position by breaching the Indenture than it would have occupied if it had honored the contract.  That result would be completely inequitable and contrary to the terms of the Indenture.

The Second Circuit has already rejected the arguments advanced by Cash America.  *Sharon Steel Corp.* v. *Chase Manhattan Bank, NA.*, 691 F.2d 1039 (2d Cir. 1982), concerned various bonds issued or guaranteed by UV Industries, Inc.  The bonds contained provisions permitting UV to redeem the bonds prior to the stated maturity date in exchange for UV's payment of a redemption price.  *See id.* at 1042.  The redemption price included principal, accrued interest, and a redemption premium.  *Id.*  The bonds also allowed acceleration as a permissive and non-exclusive remedy in the event of a default.  *Id.* at 1043, 1053.  The bonds contained a "successor obligor" provision entitling UV to assign its bonds to a corporate successor if the successor purchased all or substantially all of UV's assets.  *See id.* at 1043–45.

Without redeeming the bonds, UV proceeded to sell its assets piecemeal to multiple buyers.  *See id.* at 1045–47.  UV took the position that in the last of these sales, UV sold all or substantially all of UV's *remaining* assets.  UV therefore argued that this final purchaser was entitled to assume its bonds under the "successor obligor" provisions.  *See id.* at 1049.  The Second Circuit found that the final sale was not a sale of all or substantially all of UV's assets within the meaning of the indentures.  *See id.* at 1051–52.  The "successor obligor" provisions were therefore not applicable.  *Id.* at 1052.  Instead, UV's adoption of a voluntary plan to liquidate itself through sales to multiple buyers had resulted in a breach of the indentures.  *See id.* at 1051–52.

The portion of *Sharon Steel* that is primarily relevant here, however, concerns the remedy to which UV's bondholders were entitled.  The district court in *Sharon Steel* held, as

14

Cash America argues here, that UV's bonds could be accelerated in the event of a default, but

that the bondholders were not entitled to payment of the redemption price:

> [The district court] held that the redemption premium under the
> indentures need not be paid by UV.  [Its] reasoning was essentially
> that UV defaulted under the indenture agreement and that the
> default provisions provide for acceleration rather than a
> redemption premium.

*Id.* at 1053.

The Second Circuit, however, reversed that ruling.  In the passage of its opinion

that immediately followed the quotation above, the Second Circuit disagreed with the district

court and held that UV was required to pay the redemption price:

> We do not agree.  The acceleration provisions of the indentures are
> explicitly permissive and not exclusive of other remedies.  We see
> no bar, therefore, to the Indenture Trustees seeking specific
> performance of the redemption provisions where the debtor causes
> the debentures to become due and payable by its voluntary actions.
>
> This is not a case in which a debtor finds itself unable to make
> required payments.  The default here stemmed from the plan of
> voluntary liquidation . . . , followed by the unsuccessful attempt to
> invoke the successor obligor clauses.  The purpose of a redemption
> premium is to put a price upon the voluntary satisfaction of a debt
> before the date of maturity.  While such premiums may seem
> largely irrelevant for commercial purposes in times of high interest
> rates, they nevertheless are part of the contract and would apply in
> a voluntary liquidation which included plans for payment and
> satisfaction of the public debt.  We believe it undermines the plain
> purpose of the redemption provisions to allow a liquidating debtor
> to avoid their terms simply by failing to take the steps necessary to
> redeem the debentures, thereby creating a default.  We hold,
> therefore, that the redemption premium must be paid.

*Id*.

*Sharon Steel* dictates that an issuer of bonds cannot avoid the payment of a

redemption price by voluntarily entering into a transaction that breaches the indenture, and then

arguing that the bondholders' sole remedy is acceleration.  To the contrary, *Sharon Steel* requires

15

that in these circumstances, the issuer must pay the redemption price.  As the Second Circuit said, "[w]e believe it undermines the plain purpose of the redemption provisions to allow a liquidating debtor to avoid their terms simply by failing to take the steps necessary to redeem the debentures, thereby creating a default."  *Id.*  That is equally true of a debtor like Cash America that wishes to engage in prohibited dispositions of its property, even if those dispositions fall short of complete liquidation.

Cash America advances precisely the arguments rejected by *Sharon Steel*. According to Cash America, "Section 6.02 (Acceleration) provides the only remedy under the Indenture for an Event of Default and a payment obligation by the Company upon an Event of Default."  (Rieman Ex. 12; *see also* Rieman Ex. 13.)  But here, as in *Sharon Steel*, acceleration is a permissive remedy; the Trustee had no obligation to accelerate.  (Rieman Ex. 1, at §§ 6.02, 6.03; *see also id*. at § 6.13 ("No right or remedy conferred or reserved to the Trustee or to the Holders under this Indenture is intended to be exclusive of any other right or remedy . . . .").) *See Sharon Steel*, 691 F.2d at 1053; *see also* Charles & Kleinhaus, *supra* p. 13, at 547.

According to Cash America, Section 3.01 "makes clear that a make-whole redemption is due and payable only when and if Cash America voluntarily elects to redeem the Notes, which it has not done."  (Rieman Ex. 13.)  But redemption was also "voluntary" in exactly this sense in *Sharon Steel*.  *See Sharon Steel*, 691 F.2d at 1042 (describing "clauses *permitting* redemption by UV prior to the maturity date" (emphasis added)); *see also Sharon Steel Corp.* v. *Chase Manhattan Bank, N.A.*, 521 F. Supp. 118, 127 (S.D.N.Y. 1981) ("The redemption provisions of the Indentures state rather generally that the debentures may be redeemed *at the option of the company* at any time after a certain date . . . ." (emphasis added)), *aff'd in part and rev'd in part*, 691 F.2d 1039 (2d Cir. 1982).  Cash America could have chosen

16

not to undertake the Spin-Off, just as the issuer in *Sharon Steel* could have chosen not to undertake its liquidation. But once Cash America and the issuer in *Sharon Steel* decided to undertake voluntary transactions disposing of corporate property, those issuers were required to proceed in conformity with the governing indentures. That means here, just as it meant in *Sharon Steel*, that the issuer should have redeemed its bonds. Here, as in *Sharon Steel*, the proper remedy for the issuer's breach is consequently an award of the redemption price.

*Sharon Steel*, which is binding precedent here, was an established part of the common law of New York governing commercial indentures at the time the Indenture was executed. *See In re Granite Broad. Corp.*, 369 B.R. 120, 144 (Bankr. S.D.N.Y. 2007) (stating that under *Sharon Steel*, a lender may collect a make-whole premium for breach of an indenture); Charles & Kleinhaus, *supra* p.13, at 545–48 ("The logic of *Sharon Steel* is hard to contest."); *see also In re MPM Silicones, LLC*, No. 14-22503-RDD, 2014 WL 4436335, at *15 (Bankr. S.D.N.Y. Sept. 9, 2014) (noting that under *Sharon Steel*, it is "well-recognized" that a lender may be entitled to a make-whole premium following certain defaults by the debtor), *aff'd*, 531 B.R. 321 (S.D.N.Y. 2015). Sophisticated issuers of bonds like Cash America have been on notice since 1982 that bond indentures governed by New York law would also be governed by *Sharon Steel*.

*Sharon Steel* reflects the fundamental principles that contract damages should provide the non-breaching party with "the benefit of the bargain," and that the non-breaching party should be placed "in as good a position as it would have been in had the contract been performed.'" *Bi-Economy Mkt., Inc.* v. *Harleysville Ins. Co. of N.Y.*, 886 N.E.2d 127, 132 (N.Y. 2008); *see* Restatement (Second) of Contracts § 347 cmt. a (1981); *id.* § 344; *Clearview Concrete Prods. Corp.* v. *S. Charles Cherardi*, 453 N.Y.S.2d 750, 756 (App. Div. 2d Dep't

17

1982); E. Allen Farnsworth, *Legal Remedies for Breach of Contract*, 70 Colum. L. Rev. 1145, 1147–48 (1970) (contractual damages include "disappointment in [the injured party's] expectation, as measured by the net gain that he would have enjoyed had the promise been performed, or as it is often said, by giving him the 'benefit of the bargain.'").

Section 3.01 of the Indenture sets forth in detail how to calculate the redemption price. Under Section 3.01, the redemption price as of the date of the Spin-Off (November 13, 2014) was $113.72 for each $100 in face amount of the Notes outstanding, plus accrued and unpaid interest. (56.1 ¶ 63.) If the Court rules that the Trustee is entitled to payment of the redemption price, the Trustee will attempt to agree with Cash America on the precise amount owed under Section 3.01. That amount will include the redemption price, plus default interest on the redemption price calculated in accordance with the Notes, minus certain offsetting payments by Cash America.

## Conclusion

The Trustee respectfully requests that the Court enter summary judgment finding that by executing the Spin-Off, Cash America breached Section 5.01 of the Indenture, and awarding the Trustee, for distribution to the Noteholders, an amount equal to the redemption price for the Notes as of the date of the Spin-Off, calculated in accordance with Section 3.01 of the Indenture (quoted *supra* p. 5 n.3), plus interest thereon at the default rate set forth in Section 2 of the Notes (Rieman Ex. 1, at Ex. A, at A-5) commencing on the date of the Spin-Off, and minus offsets for Cash America's periodic payments of interest on the Notes after the Spin-Off.

18

The Trustee also respectfully requests an award of all fees, costs, and expenses incurred by the

Trustee in enforcing the rights of the Noteholders pursuant to Section 6.12 of the Indenture.

Dated:    New York, New York
          January 29, 2016

                              Respectfully submitted,

                              PAUL, WEISS, RIFKIND,
                                WHARTON & GARRISON LLP

                              By:  ___/s/ Walter Rieman_____
                                  Walter Rieman
                                  (wrieman@paulweiss.com)
                                  Andrew N. Rosenberg
                                  Karen R. King
                                  Michael S. Rudnick
                              1285 Avenue of the Americas
                              New York, NY 10019-6064
                              Telephone: (212) 373-3000
                              Facsimile: (212) 757-3990

                              *Attorneys for Plaintiff*

19