**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------  x

|  |  |  |
|---|---|---|
| **WILMINGTON SAVINGS FUND SOCIETY, FSB,** | ) | **No. 15-cv-5027 (JMF)** |
|  | ) |  |
|  | ) | **ECF CASE** |
| Plaintiff, | ) |  |
|  | ) |  |
| -v.- | ) |  |
|  | ) |  |
| **CASH AMERICA INTERNATIONAL, INC.,** | ) |  |
|  | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |
|  | ) |  |

--------------------------------------------------------  x

# MEMORANDUM OF LAW
## IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

JONES DAY

Robert C. Micheletto
Rajeev Muttreja
Andrew S. Kleinfeld
222 East 41st Street
New York, NY 10017-6702
(212) 326-3939
rmicheletto@jonesday.com
rmuttreja@jonesday.com
askleinfeld@jonesday.com

*Attorneys for Defendant Cash America International, Inc.*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS .................................................................................................... 4

      A.    The Notes Offering ............................................................................ 4

      B.    The Relevant Indenture Provisions ............................................... 5

           1.    Optional Redemption ........................................................ 5

           2.    Sale of Assets by the Company ...................................... 6

           3.    Default And Remedies ..................................................... 7

      C.    The Enova Spin-Off ......................................................................... 7

      D.    This Dispute ..................................................................................... 10

STANDARD OF REVIEW ................................................................................................. 10

ARGUMENT ........................................................................................................................ 11

      I.    The Enova Spin-Off Is Not a Disposition Prohibited by Section 5.01 of the Indenture, Because It Was Expressly Permitted By Section 5.01(2)(iii) ............. 11

      II.    As a Matter of Law, the Trustee May Not Force Cash America to Redeem the Notes ............................................................................................................. 13

           A.    Under the Indenture's Unambiguous Text, Cash America Cannot Be Forced to Redeem the Notes ................................................. 13

           B.    The Trustee Cannot Overcome the Indenture's Text Through *Sharon Steel* ................................................................................... 16

CONCLUSION ..................................................................................................................... 22

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Brody v. W. & L. Enters., Inc.*,
117 N.Y.S.2d 719 (Sup. Ct. 1952) ........................................................................................15

*Cruden v. Bank of N.Y.*,
957 F.2d 961 (2d Cir. 1992) ..................................................................................................15

*F&F Rest. Corp. v. Wells, Goode & Benefit, Ltd.*,
61 N.Y.2d 496 (1984) ............................................................................................................15

*In re AMR Corp.*,
730 F.3d 88 (2d Cir. 2013) ....................................................................................................11

*In re Granite Broadcasting Corp.*,
369 B.R. 120 (Bankr. S.D.N.Y. 2007) ..................................................................................20

*In re MPM Silicones, LLC*,
No. 14-22503-RDD, 2014 WL 4436335 (S.D.N.Y. Bankr. Sept. 9, 2014) ......................19, 20

*In re S. Side House, LLC*,
451 B.R. 248 (Bankr. E.D.N.Y. 2011) ..................................................................................14

*In-City Enterprises, Inc. v. Local Union 580 of Int'l Ass'n of Bridge, Structural,*
*Ornamental, & Reinforcing Iron Workers, AFL-CIO*,
No. 13 CIV. 3792 JMF, 2014 WL 982855 (S.D.N.Y. Mar. 13, 2014) ..................................11

*Jamie Sec. Co. v. The Ltd., Inc.*,
880 F.2d 1572 (2d Cir. 1989) ................................................................................................11

*Nw. Mut. Life Ins. Co. v. Uniondale Realty Assocs.*,
816 N.Y.S.2d 831 (Sup. Ct. 2006) ........................................................................................14

*People ex rel. Knickerbocker Fire Ins. Co. v. Coleman*,
14 N.E. 431 (N.Y. 1887) ........................................................................................................13

*Quadrant Structured Products Co., Ltd. v. Vertin*,
23 N.Y.3d 549 (2014) ............................................................................................................11

*Rosiny v. Schmidt*,
587 N.Y.S.2d 929 (App. Div. 1st Dep't 1992) ......................................................................13

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*,
521 F. Supp. 118 (S.D.N.Y. 1981) ........................................................................................17

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*,
691 F.2d 1039 (2d Cir. 1982) ....................................................................................... *passim*

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs.*,
  63 N.Y.2d 396, 472 N.E.2d 315 (1984).................................................................................21

*W.W.W. Assocs., Inc. v. Giancontieri*,
  566 N.E.2d 639 (N.Y. 1990).............................................................................................11

**OTHER AUTHORITIES**

9A Fletcher Cyclopedia of the Law of Corporations § 4657.10 (2015) .......................................13

Fed. R. Civ. P. 56(a) ...............................................................................................................11

**PRELIMINARY STATEMENT**

This case is an effort by two hedge funds, River Birch Capital LLC and MacKay Shields LLC (collectively, the "Hedge Funds"), to reap an unwarranted windfall for their Cash America International Inc. ("Cash America") 5.75% Senior Notes due 2018 (the "Notes"). Plaintiff Wilmington Savings Fund Society, FSB (the "Trustee") is the plaintiff here in name only and is merely doing the bidding of the Hedge Funds, who directed the Trustee to bring this suit and are indemnifying it for doing so.

The Trustee claims that Cash America breached the indenture dated May 15, 2013 (the "Indenture")[1] that governs the Notes, causing an "Event of Default," by spinning off its wholly owned subsidiary Enova International, Inc. ("Enova") in November 2014. As a result, the Trustee says it can specifically enforce the Indenture's "Optional Redemption" provision (Section 3.01) and force Cash America to redeem the Notes and pay the Hedge Funds (and all other noteholders) the "redemption price," which equals the principal amount of the Notes, plus accrued and unpaid interest, plus what is commonly referred to as a "make-whole premium." The Trustee is wrong on both counts.

First, the Enova spin-off did not breach the Indenture, which requires summary judgment in Cash America's favor on both of the Trustee's claims. Assuming the Enova spin-off was a "Disposition" under the Indenture (as the Trustee claims), the transaction was expressly permitted by Section 5.01(2)(iii) of the Indenture. That provision allows "Dispositions" of property so long as the "aggregate book value of the properties disposed of" does not exceed the "Disposition Limit," which in this case was approximately $208 million. The Enova spin-off involved the distribution of shares with an aggregate book value of just $79.6 million, well under

---

[1]    The Indenture is attached as Exhibit 1 to the accompanying Declaration of Thomas A. Bessant, Jr.

1

the Disposition Limit, and was thus expressly permitted.  Although the Trustee calculates a far higher figure, the Trustee considers only Enova's assets and fails to account for Enova's liabilities, which must be done to properly calculate the shares' "aggregate book value."

Second, at a minimum, Cash America is entitled to summary judgment on the Trustee's second claim, because the Trustee cannot specifically enforce the Indenture's Optional Redemption provision.  The plain language of that provision, with which the Trustee never engages, dooms this claim.

As its name suggests, the Optional Redemption provision gives Cash America the "option" to redeem the Notes before their maturity date.  It states that Cash America "may"—not "shall"—redeem the Notes, and only if it elects to do so must Cash America pay the redemption price, including the make-whole premium.  The Indenture does not make redemption mandatory in any circumstance.  Nor does the Indenture state that redemption is an available remedy for an Event of Default.  Rather, the sole remedy in the Indenture for an Event of Default is acceleration, which does not include the payment of a make-whole premium.

Contrary to the Trustee's contention, it does not matter that Section 6.03 of the Indenture permits the Trustee to "pursue . . . any available remedy by proceeding at law or equity to collect the payment of principal and interest on the Notes or to enforce the performance of the Notes or the Indenture."  As is clear from the text, that provision merely describes the power of the Trustee to enforce rights, or the performance of covenants, that are *contained* in the Indenture.  It does not, as the Trustee apparently wishes, *create* rights or covenants not already in the Indenture.

Notwithstanding the unequivocal language of the Indenture, however, the Trustee claims that, under *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039 (2d Cir. 1982), "if

2

Cash America wanted to engage in a prohibited transaction [allegedly, the Enova spin-off], it was required to redeem the Notes by paying the make-whole amount or to obtain the consent of the Noteholders," and "the proper remedy for [Cash America's] breach is consequently an award of the redemption price." (Trustee Br. at 2.)  But *Sharon Steel* says no such thing.

In *Sharon Steel*, as a consequence of voluntarily adopting a plan of liquidation, the debtor UV Industries was obligated to redeem the notes in question and, pursuant to the terms of the indentures, pay a make-whole premium.  As the court found, the debtor had "cause[d] the debentures *to become due and payable* by its voluntary actions."  691 F.2d at 1053 (emphasis added).  But instead of redeeming the notes and paying the make-whole premium, the debtor in *Sharon Steel* engaged in a piecemeal sale of all of its assets and, in connection with the sale of its last remaining assets, purported to assign the notes (and all obligations thereunder) to its largest shareholder, Sharon Steel Corp.  The Second Circuit held that the assignment of the notes to Sharon Steel violated the "successor obligor" provisions of the indentures, giving rise to an event of default.

The Second Circuit then rejected the argument that, because the trustees had declared the event of default, their only remedy was acceleration, and they could not specifically enforce the redemption provisions of the indentures.  Because the debtor was under an existing obligation to redeem the notes and pay the make-whole premium at the time of the event of default, the *Sharon Steel* court found that "it [would] undermine[] the plain purpose of the redemption provisions to allow a liquidating debtor to avoid their terms simply by failing to take the steps necessary to redeem the debentures" and instead creating an event of default and arguing that acceleration is the exclusive remedy.  *Id.*  For this reason, the court held that declaring an event of default imposed "no bar . . . to the [trustees] seeking specific performance of the redemption

3

provisions where the debtor *causes the debentures to become due and payable by its voluntary actions*." *Id.* (emphasis added).

*Sharon Steel* does not support the Trustee's view that redemption is an available remedy for a "voluntary" default. *Sharon Steel* stands only for the unremarkable proposition that a debtor cannot avoid an existing obligation to redeem notes and pay a make-whole premium by causing an event of default and then asserting that the noteholders' only remedy is to accelerate the debt. In contrast to the facts of *Sharon Steel*, Cash America was under no existing obligation to redeem the Notes at the time of the alleged Event of Default (the Enova spin-off). And neither the Indenture's terms nor *Sharon Steel* support the Trustee's contorted argument to the contrary.

Moreover, courts have understood *Sharon Steel* to apply only when the debtor intentionally defaults in order to trigger acceleration and evade the make-whole premium. That is not remotely the situation here. Cash America was never obligated to redeem the Notes and pay a make-whole premium, and thus it had nothing to "evade" by engaging in the Enova spin-off. In addition, Cash America executed the Enova spin-off for legitimate business reasons having nothing to do with the Indenture or the Notes.

In short, then, *Sharon Steel* is not anything close to the silver bullet that the Trustee suggests. The Trustee accordingly lacks any basis to specifically enforce the Optional Redemption provision in the Indenture.

## STATEMENT OF FACTS

### A. The Notes Offering

Defendant Cash America is a publicly traded Texas corporation with its principal place of business in Fort Worth, Texas. Defendant's Response to Plaintiff's Local Rule 56.1 Statement ("56.1 Response") ¶ 1. Cash America provides specialty financial services to unbanked and underbanked individuals in need of convenient and immediate access to cash and other financial

products and services.  Defendant's Local Rule 56.1 Statement of Additional Material Facts Relevant to Defendant's Cross-Motion for Summary Judgment ("56.1 Statement") ¶ 1.  The products and services offered by Cash America are often referred to as "alternative financial services" and include pawn loans, dispositions of related merchandise, and, to a lesser extent, consumer loans (including single-payment loans and installment loans).  *Id.* ¶ 2.

On May 15, 2013, Cash America completed a private offering of $300 million of the Notes and, in connection therewith, entered into the Indenture with Wells Fargo Bank, National Association ("Wells Fargo"), as Trustee and various domestic subsidiaries of Cash America as guarantors.  *Id.* ¶ 3.  Wells Fargo resigned as Trustee under the Indenture on February 19, 2015, and was later replaced by Plaintiff.  *Id.* ¶ 6.

### B.  The Relevant Indenture Provisions

This dispute concerns provisions in the Indenture regarding the redemption of Notes, the sale of assets by Cash America, events of default, and remedies.  These provisions are set forth below.

### 1.  Optional Redemption

Section 3.01 of the Indenture is entitled "Optional Redemption."  This provision, which gives Cash America the *option* to pay off the Notes early, specifically states as follows:

> At any time and from time to time, upon not less than 30 nor more than 60 days' notice, the Company ***may*** redeem some or all of the Notes at a redemption price equal to the greater of the following amounts: (x) 100% of the principal amount of the Notes being redeemed on the redemption date; and (y) the sum of the present values of the remaining scheduled payments of principal and interest on the Notes being redeemed on that redemption date (not including the amount of accrued and unpaid interest to, but excluding, the redemption date) discounted to the redemption date on a semi-annual basis at the Treasury Rate, as determined by the Reference Treasury Dealer, plus 50 basis points; plus, in each case, accrued and unpaid interest on the Notes being redeemed to, but excluding, the redemption date.

Indenture § 3.01 (emphasis added).

**2.    Sale of Assets by the Company**

Section 5.01 of the Indenture is entitled "Consolidation, Merger or Sale of Assets by the Company." This provision prohibits Cash America from engaging in certain transactions, and expressly permits certain transactions that would otherwise be barred. It provides in relevant part as follows:

> The Company will not . . . dissolve or liquidate or consolidate or merge with, or sell, assign, convey, exchange, lease or otherwise dispose of its properties to, any other Person except that:
>
> *   *   *
>
> (2)    the Company may and may permit any of its Subsidiaries to sell, assign, convey, exchange, lease or otherwise dispose of its properties (including, without limitation, capital stock, accounts receivable and pawn loans) (each a "Disposition") to, any Person if:
>
> *   *   *
>
> (iii)   such Disposition does not constitute the Enova Disposition and the aggregate book value of the properties disposed of by the Company and its Subsidiaries during the 12 month period then most recently ended (other than pursuant to the Enova Disposition) does not exceed an amount equal to the lesser of (x) 17.5% of Consolidated Total Assets as of the end of the then most recently ended fiscal quarter of the Company or (y) the amount of the asset disposition permission then in effect and set forth in Section 6.5(e) of the Existing Bank Loan Agreement (or the lowest amount set forth in any similar provision if said Section 6.5(e) shall have been amended after March 30, 2011) or the lowest amount set forth in any similar provision in any bank credit facility or bank credit facilities that refinance or replace the Existing Bank Loan Agreement (as in effect from time to time the "Disposition Limit") . . . ;
>
> *   *   *
>
> (7)    For purposes of determining the book value of property constituting capital stock or similar equity interests of a Subsidiary of the Company disposed of as provided in Section 5.01(2), such book value shall be deemed to be the aggregate book value of all assets of the Subsidiary that shall have issued such capital stock or similar equity interests.

Indenture § 5.01.

6

### 3.    Default and Remedies

Section 6.01 of the Indenture is entitled "Events of Default."  It provides in relevant part as follows:

> An "Event of Default" shall exist if any of the following conditions or events shall occur and be continuing:
>
> \*    \*    \*
>
>  (3)    . . . the Company or any Guarantor fails to comply with Article 5 hereof;

Indenture § 6.01.

Section 6.02 of the Indenture, which is entitled "Acceleration," is the *only* remedy in the Indenture for an Event of Default.  It provides in relevant part as follows:

> If an Event of Default, other than a bankruptcy default with respect to the Company, occurs and is continuing under the Indenture, the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes then outstanding, by written notice to the Company (and to the Trustee if the notice is given by the Holders), may, and the Trustee at the request of such Holders shall, declare the principal of and accrued interest on the Notes to be immediately due and payable.  Upon a declaration of acceleration, such principal and interest will become immediately due and payable.

Indenture § 6.02.

Section 6.03 is entitled "Other Remedies."  It provides in relevant part as follows:

> If an Event of Default occurs and is continuing, the Trustee may pursue, in its own name or as trustee of an express trust, any available remedy by proceeding at law or in equity to collect the payment of principal of and interest on the Notes or to enforce the performance of any provision of the Notes or the Indenture.

Indenture § 6.03.

### C.  The Enova Spin-Off

Prior to November 2014, Cash America offered its services to consumers through two separate businesses: retail (composed of domestic and international storefront locations) and e-commerce (composed of domestic and international online lending channels).  56.1 Statement

7

¶ 7. Its wholly owned subsidiary at the time, Enova, conducted the e-commerce business. *Id.* ¶ 8.

In December 2013, Cash America began evaluating strategic alternatives for the possible separation of its retail and e-commence businesses. *Id.* ¶ 9. Cash America's management considered whether the company and its shareholders would benefit from separating the e-commerce business from the retail segment. *Id.* ¶ 10. Management believed at the time that a separation would enable Cash America's and Enova's management each to pursue a more focused, industry-specific strategy; to concentrate resources wholly on their respective relevant market segments, regulatory requirements, customers, and core businesses, with greater ability to anticipate and respond to changing markets and opportunities; and to allow each company to recruit and retain employees with expertise directly applicable to its needs. *Id.* ¶ 11. The separation would also create two "pure play" companies that investors could more easily understand, given the companies' different business distribution channels, product mix, geographies, growth strategies, expense burdens, and regulatory risks. *Id.* ¶ 12.

At a special meeting of Cash America's board of directors on April 9, 2014, there was a lengthy discussion of the reasons for and advantages and disadvantages of a potential separation of Enova and the separation options for Enova, including a tax-free spin-off of Enova common stock, a potential sale of Enova, and an initial public offering of Enova. *Id.* ¶¶ 14-16. At the meeting, Cash America's board concluded that a separation of Enova was in the best interests of both Cash America and Enova as well as Cash America's shareholders. *Id.* ¶ 17. The board authorized management to consider potential strategic alternatives for the separation (specifically, a spin-off and a sale), to develop plans for the board's consideration, and to eventually recommend a preferred separation option. *Id.* ¶ 18.

On July 23, 2014, Cash America's board of directors discussed the advantages and disadvantages of both a spin-off and sale of Enova and the economic considerations of each separation option. *Id.* ¶¶ 24-26. The board unanimously concluded that it would be in the best interests of Cash America and its shareholders to pursue the Enova spin-off. *Id.* ¶ 28.

Cash America decided to structure the separation as a tax-free spin-off of 80% of Enova that would take the form of a dividend of Enova common stock to Cash America's shareholders. *Id.* ¶ 29. This structure was chosen for the following reasons:

1. A spin-off was expected to contain less market risk compared to the other separation alternatives (a sale or an IPO);

2. A spin-off was considered to be a less complex and lengthy process than a sale or IPO;

3. A spin-off was considered a more tax efficient transaction for shareholders with a greater degree of execution certainty;

4. A spin-off of Enova provided the greatest flexibility for Cash America shareholders, as it provided shareholders the opportunity to retain their existing ownership or sell the shares of Enova after a spin-off; and

5. A spin-off of 80% of Enova also allowed for the future sale of the residual 20% ownership of Enova to generate cash flow for the payment of debt and maintain liquidity.

*Id.* On October 22, 2014, Cash America's board of directors decided to proceed with the Enova spin-off. *Id.* ¶ 30.

On November 13, 2014, Cash America completed the Enova spin-off by distributing 80% of the outstanding shares of Enova common stock to Cash America's shareholders of record, who received 0.915 shares of Enova common stock for each share of Cash America common stock they held. *Id.* ¶ 32. Cash America retained the other 20% of the outstanding shares of Enova common stock. *Id.* ¶ 34.

9

Cash America did not engage in the Enova spin-off for any reason related to the Indenture or the Notes. *Id.* ¶ 35. In particular, the Enova spin-off was not designed, planned, or intended in any way to trigger acceleration of the Notes in order to avoid redeeming them and paying the make-whole premium. *Id.* ¶ 36.

The Enova spin-off did not damage the noteholders. After the Enova spin-off, Cash America had ample liquidity and capital resources to repay the Notes and for its ongoing business operations, including $252.9 million of available credit as of December 31, 2015. *Id.* ¶¶ 58, 62. At that time, $184.5 million in aggregate principal amount of the Notes remained outstanding. *Id.* ¶ 61.

## D. This Dispute

At the direction of the Hedge Funds, the Trustee commenced this action on June 26, 2015.[2] The Trustee's Complaint asserts two claims. First, the Trustee seeks a declaratory judgment that the Enova spin-off "violated Section 5.01 of the Indenture, resulting in an immediate Event of Default pursuant to Section 6.01(3) of the Indenture." *See* Compl. ¶¶ 24-31. Second, the Trustee seeks specific performance of the optional redemption provision set forth in Section 3.01 of the Indenture including, in particular, payment of the make-whole premium, because Cash America "caused an Event of Default which would allow the Trustee to declare the Notes to become due and payable before the date of maturity by willful consummation of the [Enova spin-off], in violation of the Indenture." *See* Compl. ¶¶ 32-36.

---

[2]  On June 22, 2015, the Hedge Funds sent the Trustee a "Noteholder Request and Indemnification Letter" in which they requested that the Trustee institute legal proceedings in its own name against Cash America. 56.1 Statement ¶¶ 64-65. In return, the Hedge Funds promised to indemnify the Trustee for any fees and expenses it incurred in connection with the litigation. *Id.* ¶ 66.

## STANDARD OF REVIEW

"Summary judgment is warranted when the admissible evidence and the pleadings demonstrate 'no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law.'" *In-City Enterprises, Inc. v. Local Union 580 of Int'l Ass'n of Bridge, Structural, Ornamental, & Reinforcing Iron Workers, AFL-CIO*, No. 13 CIV. 3792 JMF, 2014 WL 982855, at *2 (S.D.N.Y. Mar. 13, 2014) (Furman, J.) (quoting Fed. R. Civ. P. 56(a)).  As this Court has explained, summary judgment is warranted on a claim when it is "unambiguous" that the governing contract precludes a plaintiff's requested relief.  *Id.*

## ARGUMENT

The Indenture is governed by New York law, and "under New York law interpretation of indenture provisions is a matter of basic contract law."  *Quadrant Structured Products Co., Ltd. v. Vertin*, 23 N.Y.3d 549, 559 (2014) (brackets and internal quotation marks omitted); *see also, e.g.*, *Jamie Sec. Co. v. The Ltd., Inc.*, 880 F.2d 1572, 1576 (2d Cir. 1989) ("It is a well-established rule in this Circuit that the interpretation of Indenture provisions is a matter of basic contract law." (brackets and internal quotation marks omitted)).  "'When parties set down their agreement in a clear, complete document,' the New York Court of Appeals has said, 'their writing should as a rule be enforced according to its terms.'"  *In re AMR Corp.*, 730 F.3d 88, 98 (2d Cir. 2013) (brackets omitted) (quoting *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990)).  The plain terms of the Indenture require summary judgment in Cash America's favor on both of the Trustee's claims.

## I.    The Enova Spin-Off Is Not a Disposition Prohibited by Section 5.01 of the Indenture, Because It Was Expressly Permitted By Section 5.01(2)(iii).

The Enova spin-off was not prohibited by Section 5.01 of the Indenture.  Assuming it was indeed a "Disposition" as the Trustee claims, the Enova spin-off was expressly permitted

11

because it did not exceed the "Disposition Limit" in Section 5.01(2)(iii).  This warrants summary judgment on both of the Trustee's claims.

Section 5.01 states that Cash America may not "sell, assign, convey, exchange, lease or otherwise dispose of its properties" unless the transaction qualifies for one of three exceptions under Section 5.01(2).  The Enova spin-off qualifies for the third exception, which permits any disposition that "does not constitute the Enova Disposition" and where "the aggregate book value of the properties disposed of by the Company and its Subsidiaries during the 12 month period then most recently ended . . . does not exceed" what is defined in the Indenture as the "Disposition Limit."  Indenture § 5.01(2)(iii).

There is no dispute that the Enova spin-off "does not constitute the Enova Disposition" (essentially, an initial public offering).  56.1 Statement ¶ 39.  Nor is there any dispute that, for present purposes, the Disposition Limit "was 10% of Cash America's Consolidated Total Assets as of the last day of" the 2013 fiscal year.  *Id.* ¶ 40.  There is also no dispute that, given Cash America's assets as of December 31, 2013, the Disposition Limit was approximately $208 million.  *Id.* ¶ 42; 56.1 Response ¶ 57.

The question, then, is whether "the aggregate book value of all assets" at issue—*i.e.*, the "aggregate book value" of 80% of all Enova shares—exceeded the $208 million Disposition Limit.  Indenture § 5.02(7).  It did not.  The "aggregate book value" of these Enova shares, which is 80% of the book value of Enova, was only $79,640,000.  56.1 Response ¶ 59; 56.1 Statement ¶ 50.[3]  That is obviously far less than the $208 million Disposition Limit, and the

---

[3]    Indeed, Cash America's audited financial statements included in its Form 10-K for the annual period that ended on December 31, 2014 show that Cash America deducted this sum ($79,640,000) from its books as a result of the Enova Spin-Off.  56.1 Statement ¶ 50.

Enova spin-off was thus expressly permitted by Section 5.01(2)(iii) of the Indenture and was not an Event of Default.

Disagreeing, the Trustee argues that the book value of the Enova shares at issue "was $608,350,400," nearly triple the Disposition Limit.  (Trustee Br. at 11.)  When calculating this figure, however, the Trustee wrongly considers only Enova's *assets*.  (*See id.*)  Determining "book value" calls for "estimating all the assets as they appear upon the corporate books, and *deducting all the liabilities* and other matters required to be deducted by law, and taking the balance as the measure of value for assessment."  *People ex rel. Knickerbocker Fire Ins. Co. v. Coleman*, 14 N.E. 431, 432 (N.Y. 1887) (emphasis added); *see also, e.g.*, *Rosiny v. Schmidt*, 587 N.Y.S.2d 929, 931 (App. Div. 1st Dep't 1992) (describing "book value" as "an unambiguous term," citing *Knickerbocker*).  Indeed, it is well-settled that the term "book value" is "not an ambiguous term" and "has the generally accepted meaning of *assets minus liabilities*."  9A Fletcher Cyclopedia of the Law of Corporations § 4657.10 (2015) (emphasis added).  By focusing strictly on Enova's assets without deducting Enova's liabilities, the Trustee has miscalculated the "aggregate book value" of the Enova shares at issue and, consequently, is wrong about whether the Enova spin-off was a permitted disposition under the Indenture.

Because the Enova spin-off did not violate the terms of the Indenture, Cash America is entitled to summary judgment on both of the Trustee's claims.

## II.  As a Matter of Law, the Trustee May Not Force Cash America to Redeem the Notes.

### A.  Under the Indenture's Unambiguous Text, Cash America Cannot Be Forced to Redeem the Notes.

The Trustee contends that Cash America must redeem the Notes under Section 3.01, and must pay the make-whole premium, because the Enova spin-off constituted a voluntary Event of

Default.  Even if the Enova spin-off were an Event of Default—which it was not—the text of the Indenture defeats the Trustee's claim.

Section 3.01 of the Indenture, which again is entitled "Optional Redemption," provides that Cash America "*may redeem* some or all of the Notes at [the applicable] redemption price" that includes the make-whole premium.  In other words, Section 3.01 requires payment of the "redemption price" only when Cash America voluntarily *chooses* to redeem Notes—as Cash America might do if, for example, interest rates fell substantially below the interest rate on the Notes.  Cash America "may" initiate redemption by "send[ing] notice of [the] redemption at least 30 days but not more than 60 days before the redemption date to each registered Holder of the Notes to be redeemed."  Indenture § 3.02.  Aside from this redemption notice, the Indenture provides no other trigger for the payment of the redemption price—and provides no circumstances under which Notes *must* be redeemed.

Cash America did not send a notice of redemption pursuant to Section 3.02 of the Indenture.  56.1 Statement ¶ 38.  Nor has Cash America otherwise attempted to redeem the Notes at issue.  *Id.*  As a result, there is simply no basis under the Indenture for the Trustee's claim that Cash America must redeem the Notes and pay the redemption price.

Claiming otherwise, the Trustee cites the Enova spin-off.  But even if the Enova spin-off created an Event of Default as the Trustee claims, that would not enable the Trustee to force redemption.  "As a general rule, a [debt holder] is not entitled to prepayment consideration after a default unless the parties' agreement expressly requires it."  *In re S. Side House, LLC*, 451 B.R. 248, 268 (Bankr. E.D.N.Y. 2011), *aff'd sub nom. U.S. Bank Nat. Ass'n v. S. Side House, LLC*, No. 11-CV-4135 ARR, 2012 WL 273119 (E.D.N.Y. Jan. 30, 2012); *see also, e.g., Nw. Mut. Life Ins. Co. v. Uniondale Realty Assocs.*, 816 N.Y.S.2d 831, 836 (Sup. Ct. 2006) ("A prepayment

14

premium will not be enforced under default circumstances in the absence of a clause which so states."). And the Indenture certainly does not require redemption for a default. The Indenture's prescribed remedy for an Event of Default is acceleration. Under Section 6.02, the Trustee may "declare the principal of and accrued interest on the Notes to be immediately due and payable." The Indenture does not say or imply that redemption or the redemption price described by Section 3.01 has *any* relevance to an Event of Default.

Section 6.03 of the Indenture does, to be sure, note that, "[i]f an Event of Default occurs," the Trustee "may pursue . . . any available remedy by proceeding at law or in equity . . . to enforce the performance of any provision of the Notes or the Indenture." Seizing on this, the Trustee notes that "acceleration is [only] a permissive remedy" under the Indenture. (Trustee Br. at 16.) But that does not help the Trustee here.

All Section 6.03 authorizes is "any *available* remedy . . . to *enforce* the performance of any provision of the Notes or the Indenture" (emphasis added). Thus, the Trustee may only "*enforce*"—not rewrite—the Indenture when seeking specific performance. Indeed, "[t]he remedy of specific performance presupposes the existence of an express agreement whereby the party complained against *specifically undertook and obligated himself to do and perform a definite and certain act or thing.*" *Brody v. W. & L. Enters., Inc.*, 117 N.Y.S.2d 719, 722 (Sup. Ct. 1952) (emphasis added); *see also, e.g.*, *Cruden v. Bank of N.Y.*, 957 F.2d 961, 976 (2d Cir. 1992) ("A court may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case." (citation omitted)); *F&F Rest. Corp. v. Wells, Goode & Benefit, Ltd.*, 61 N.Y.2d 496, 502 (1984) ("[A] [party] who obtains specific

15

performance of his contract is entitled to no greater rights than he would have had had the contract been performed at the agreed time." (citation omitted)).

Whether acceleration is a "permissive" remedy is accordingly beside the point. The key is whether redemption is an "*available* remedy" under the Indenture. Indenture § 6.03 (emphasis added). As explained, it is not—and the Trustee should know this. When describing Section 6.02 of the Indenture, which states that the Trustee "may" accelerate the Notes after a default, the Trustee says this provision imposes "no obligation to accelerate upon the occurrence of an Event of Default." (Trustee Br. at 6.) Exactly. So too with Section 3.01, which states only that Cash America "may" redeem Notes.

The plain text of the Indenture thus squarely forecloses the Trustee's second claim for specific performance of the Optional Redemption provision. On this basis, this Court should grant summary judgment in Cash America's favor on that claim.

**B.   The Trustee Cannot Overcome the Indenture's Text Through *Sharon Steel*.**

Undeterred by the Indenture's clear text, the Trustee insists that it is nonetheless entitled to force redemption under Section 3.01 because Cash America "voluntarily enter[ed] into a transaction that breaches the indenture." (Trustee Br. at 15.) "So teaches *Sharon Steel Corp. v. Chase Manhattan Bank*, 691 F.2d 1039 (2d Cir. 1982)," the Trustee argues. (Compl. ¶ 23; *see also* Trustee Br. at 15-16.) But *Sharon Steel* does *not* support the supposed rule that *any* "prohibited disposition[]" of property can require the specific performance of a redemption provision. (Trustee Br. at 15.)

*Sharon Steel* did, certainly, permit a trustee to seek redemption in lieu of acceleration after a default. But the court did *not* announce redemption as a remedy for "voluntary" defaults, as the Trustee suggests. Instead, the *Sharon Steel* court held that an event of default is "*no bar* . . . to the Indenture Trustees seeking specific performance of the redemption provisions where

16

the debtor *causes the debentures to become due and payable* by its voluntary actions" prior to the default.  691 F.2d at 1053 (emphasis added).  In such circumstances, where notes are *already* "due and payable" due to the debtor's actions and the debtor *also* subsequently defaults, a trustee or noteholder can seek redemption (as it previously could have) instead of acceleration (the remedy made available by the default).  *Id.*

Specifically, in *Sharon Steel*, the debtor UV Industries filed a voluntary liquidation plan, which required it to pay all of its obligations, including outstanding notes.  *See id.* at 1045-46; *Sharon Steel Corp. v. Chase Manhattan Bank*, N.A., 521 F. Supp. 118, 125 (S.D.N.Y. 1981).  The voluntary liquidation thus obligated UV Industries to redeem the notes, which under the terms of the indentures required payment of a make-whole premium.  *See* 691 F.2d at 1053 (emphasizing that "redemption premium[s] . . . would apply in [such] a voluntary liquidation").

The trustees of the relevant indentures "demanded that [UV Industries] pay off all the debentures within 30 days," and threatened to sue UV Industries if the company liquidated before redeeming the outstanding notes.  691 F.2d at 1046.  In response, UV Industries agreed to set aside sufficient funds to secure the debt; in exchange, the trustees agreed not to seek an injunction against liquidation.  *Id.*  The parties' obligations under the agreement would terminate either when UV Industries redeemed the notes, or when UV Industries abandoned its plan of liquidation (which, again, created an obligation to redeem).  *Id.*  Instead of doing either, UV Industries sold most of its assets in piecemeal fashion, and then sold its remaining assets and purported to assign the notes (and all of its obligations thereunder) to Sharon Steel, its largest shareholder.  *See id.*

The principal question in *Sharon Steel* was whether this assignment breached the indentures, giving rise to an event of default.  Sharon Steel argued that the assignment was

permitted by the indentures' "successor obligor" clauses, which permitted UV Industries "to assign its debt to a corporate successor which purchases 'all or substantially all' of UV's assets." *Id.* at 1044-45. By buying the final piece of a "piecemeal liquidation," the argument went, Sharon Steel Corp. bought "all or substantially all" of UV Industries' remaining assets. *Id.* at 1049. The Second Circuit emphatically disagreed:

> Accepting Sharon's position . . . would severely impair the interests of lenders. Sharon's view would allow a borrowing corporation to engage in a piecemeal sale of assets, with concurrent liquidating dividends to that point at which the asset restrictions of an indenture prohibited further distribution. A sale of "all or substantially all" of the remaining assets could then be consummated, a new debtor substituted, and the liquidation of the borrower completed. The assignment of the public debt might thus be accomplished, even though the last sale might be nothing more than a cash for cash transaction in which the buyer purchases the public indebtedness. . . . Such a transaction diminishes the protection for lenders in order to facilitate deals with little functional significance other than substituting a new debtor in order to profit on a debenture's low interest rate. We hold, therefore, that boilerplate successor obligor clauses do not permit assignment of the public debt to another party in the course of a liquidation unless "all or substantially all" of the assets of the company at the time the plan of liquidation is determined upon are transferred to a single purchaser.

*Id.* at 1051. Assigning the notes to Sharon Steel Corp. thus constituted an event of default for which acceleration was a remedy under the indentures. *See* 691 F.2d at 1046-47, 1052.[4]

Next, the court addressed whether the trustees could specifically enforce the redemption provisions of the indentures, including the payment of the make-whole premium, even though they had declared an event of default, for which acceleration was the remedy. Because "[t]he acceleration provisions of the indentures are explicitly permissive and not exclusive of other

---

[4]   This case is a far cry from *Sharon Steel*. Cash America did not dissolve, remains obligated to repay the Notes, has made all required payments under the Notes on a timely basis after the Enova spin-off, and has ample financial capacity to continue to do so. 56.1 Statement ¶¶ 52-63. Indeed, even the Trustee admits that "Cash America did not fully liquidate itself by disposing of all of its property, as the defaulting debtor did in *Sharon Steel*." (Trustee Br. at 3.)

18

remedies," the court saw "no bar . . . to the Indenture Trustees seeking specific performance of the redemption provisions where the debtor causes the debentures to become due and payable by its voluntary actions." *Sharon Steel*, 691 F.2d at 1053. As the court explained, when a debtor "causes the debentures to become due and payable" in advance of an event of default by voluntarily adopting a plan of liquidation, "it [would] undermine[] the plain purpose of the redemption provisions to allow [the] liquidating debtor to avoid their terms simply by failing to take steps necessary to redeem the debentures" and instead creating an event of default for which acceleration is the remedy. *Id.* The court thus held that "the redemption premium must be paid." *Id.*

For purposes of the Trustee's claims, that is all the Second Circuit held in *Sharon Steel*: an *existing* redemption obligation is not extinguished by an event of default that opens the door to acceleration. That holding has no applicability here, because Cash America never gave a notice of redemption and Section 3.01 of the Indenture has no other trigger. And *Sharon Steel* certainly does not hold what the Trustee argues here: that a debtor must "redeem[] its bonds" before *any* "voluntary transaction[] disposing of corporate property." (Trustee Br. at 17.) That exceedingly broad (indeed, radical) rule has absolutely no foundation in *Sharon Steel* and is directly at odds with the terms of the Indenture.

Moreover, the cases cited by the Trustee emphasize that *Sharon Steel* requires bad-faith conduct. For example, the Trustee cites *In re MPM Silicones, LLC*, where the court read *Sharon Steel* to provide that, "when [a] debtor *intentionally* defaults in order to trigger acceleration and *evade the prepayment premium or make-whole*, the debtor will remain liable for the make-whole notwithstanding acceleration of the debt." No. 14-22503-RDD, 2014 WL 4436335, at *13 (S.D.N.Y. Bankr. Sept. 9, 2014) (emphasis added) (citing *Sharon Steel*, 691 F.2d at 1053); *see*

19

Trustee Br. at 13 (citing *id.*).  Thus, as the *Silicones* court put it, if the default "is not simply a tactical device to deprive the [note] holders of a make-whole claim," then *Sharon Steel* is inapplicable.  2014 WL 4436335, at \*13; *see also, e.g.*, *In re Granite Broadcasting Corp.*, 369 B.R. 120, 144 (Bankr. S.D.N.Y. 2007) (describing *Sharon Steel* as applicable to "an intentional default by a borrower, with the intention of forcing an acceleration").

Here, there is no evidence whatsoever suggesting that the Enova spin-off was "a tactical device" executed by Cash America in order to "evade the prepayment premium or make-whole." *Silicones*, 2014 WL 4436335, at \*13.  To the contrary, the record amply demonstrates that the Enova spin-off had legitimate business purposes.  Cash America runs a retail business composed of domestic storefronts; Enova, in contrast, is an e-commerce business that offers domestic and international online lending services.  56.1 Statement ¶ 7.  Spinning-off Enova enabled each company's management to focus better on their particular industries, which each had different target markets, different regulatory requirements, different growth opportunities, and many other distinctions.  *Id.* ¶ 11.  In addition, separating the two companies made each more appealing to investors.  *Id.* ¶ 12.  Cash America spun-off Enova solely for these and other legitimate business purposes, and not so that it could "deprive" the noteholders "of a make-whole claim."  *Silicones*, 2014 WL 4436335, at \*13; 56.1 Statement ¶¶ 35-37.

The lack of case law supporting the Trustee is not surprising.  The Trustee's position— under which a trustee can force redemption after *any* voluntary default of an indenture, regardless of whether redemption is contractually triggered, and regardless of whether the debtor intended to avoid redemption obligations—would have severe ramifications.  Despite acceleration typically being the contractual remedy for events of default, noteholders would

20

always seek to force redemption instead, hoping for a jackpot from a make-whole premium.[5]

But forcing redemption in such circumstances lacks *any* textual foundation.  Far from giving

noteholders "the benefit of the bargain," as the Trustee claims (Trustee Br. at 17), the Trustee's

proposed rule would be a seismic departure from the negotiated arrangement between borrowers

and lenders—not just in this transaction but in legions of deals like it.

## CONCLUSION

For the foregoing reasons, Cash America's motion for summary judgment should be

granted.  If Cash America's motion is not granted, the Trustee's motion for summary judgment

should be denied.

Dated: February 26, 2016                        Respectfully submitted,
New York, New York

                                             JONES DAY

                                             By:  /s/ Robert C. Micheletto
                                               Robert C. Micheletto
                                               Rajeev Muttreja
                                               Andrew S. Kleinfeld
                                             222 East 41st Street
                                             New York, New York  10017
                                             Telephone:  (212) 326-3939
                                             Facsimile: (212) 755-7306
                                             rmicheletto@jonesday.com
                                             rmuttreja@jonesday.com
                                             askleinfeld@jonesday.com

                                             *Attorneys for Defendant Cash America*
                                             *International Inc.*

---

[5]   The difference between redemption and acceleration can be significant.  Here, the Trustee claims it is entitled to nearly a 14% premium on the amount it would receive through acceleration.  (Trustee Br. at 18.)  Although Cash America disputes that figure, it reflects how noteholders would *never* seek acceleration instead of redemption if both were always options for "voluntary" defaults, as the Trustee argues.  "In construing a contract," however, "one of a court's goals is to avoid an interpretation that would leave contractual clauses meaningless."  *Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs.*, 63 N.Y.2d 396, 403, 472 N.E.2d 315, 318 (1984).

**<u>DECLARATION OF SERVICE</u>**

Robert C. Micheletto, an attorney admitted to practice before the bar of this Court,

declares under penalty of perjury pursuant to 28 U.S.C. § 1746, that the foregoing

Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment and

in Support of Defendant's Cross-Motion for Summary Judgment will be served upon counsel

for defendants registered to receive electronic notices in this action via the United States District

Court for the Southern District of New York's ECF system upon filing.  Counsel for Plaintiff

are:

> Walter Rieman
> Andrew N. Rosenberg
> Karen R. King
> Michael S. Rudnick
> PAUL, WEISS, RIFKIND,
> WHARTON & GARRISON LLP
> 1285 Avenue of the Americas
> New York, NY 10019-6064
> Telephone:  212-373-3000

Dated: February 26, 2016
New York, New York

  /s/ Robert C. Micheletto_____
Robert C. Micheletto