UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                     :

WILMINGTON SAVINGS FUND SOCIETY, FSB,    :

                    Plaintiff,            :

                                          :

                -v-                 :

CASH AMERICA INTERNATIONAL, INC.,      :

                                          :

                  Defendant.          :

                                          :
------------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  09/19/2016

15-CV-5027 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

        Roughly three-and-a-half years ago, Defendant Cash America International, Inc. ("Cash America") issued $300 million of notes (the "Notes") pursuant to an indenture agreement (the "Indenture").  In this lawsuit, Plaintiff Wilmington Savings Fund Society, FSB ("Wilmington Savings"), as the trustee for the Noteholders, alleges that Cash America voluntarily breached the Indenture by spinning off a major subsidiary and seeks, in lieu of accelerating the debt, to collect a prepayment premium.  Now pending are cross-motions for summary judgment.  (Docket Nos. 22, 26).  The relevant facts are undisputed.  Instead, the parties' disputes — namely, whether Cash America did, in fact, breach the Indenture and, if so, what remedies are available to the Noteholders — derive from competing interpretations of the Indenture and applicable law.  For the reasons that follow, the Court concludes that Wilmington Savings has the better reading of both the parties' contract and of the law, so its motion for summary judgment is GRANTED while Cash America's motion for summary judgment is DENIED.

**BACKGROUND**

The relevant facts are taken from the parties' pleadings, Local Rule 56.1 Statements, and admissible evidence.  Cash America is a publicly traded Texas corporation that has provided secured non-recourse lending (among other services) since 1984.  (Docket No. 25 ("Pl.'s 56.1 Statement") ¶¶ 1-2; Docket No. 31 ("Def.'s 56.1 Statement") ¶ 1).  Before issuing the Notes, Cash America offered its services through two separate business lines: retail and e-commerce.  (Def.'s 56.1 Statement ¶ 7).  Enova International ("Enova"), a wholly-owned subsidiary, conducted the e-commerce business — which was substantial.  (Def's 56.1 Statement ¶ 8).  For example, during the first quarter of 2013 (*i.e.*, the last full quarter before Cash America issued the Notes), Enova generated approximately thirty-nine percent of Cash America's revenue.  (Docket No. 33 ("Def.'s 56.1 Response") ¶ 27).

On May 15, 2013, Cash America completed a private offering of the Notes — specifically, $300 million of 5.75% Senior Notes due 2018 — pursuant to the Indenture naming several of its subsidiaries as guarantors and naming a trustee (initially Wells Fargo Bank, N.A., and later Wilmington Savings) to represent the Noteholders.  (Def.'s 56.1 Response ¶ 3; *see* Docket No. 24 ("Rieman Decl."), Ex. 1 ("Indenture"); Pl.'s 56.1 Statement ¶¶ 5, 7).  Section 5.01 of the Indenture, titled "Consolidation, Merger or Sale of Assets by the Company," prohibits Cash America from engaging in certain transactions.  In general, it provides that Cash America "will not, and will not permit any of its Subsidiaries to, dissolve or liquidate or consolidate or merge with, or sell, assign, convey, exchange, lease or otherwise dispose of its properties to, any other Person."  (Indenture § 5.01).  That restriction, however, is subject to three exceptions, one of which is relevant here: Cash America is permitted to engage in an otherwise prohibited transaction if "the aggregate book value of the properties disposed of . . . does not exceed" ten

percent of the company's "Consolidated Total Assets."  (*Id.* § 5.01(2)(iii); *see* Docket No. 23 ("Pl.'s Mem.") 4 n.2).

The Indenture provides that if Cash America engages in a prohibited transaction (to which no exception applies) it constitutes an "Event of Default" under Section 6.01(3), which allows Wilmington Savings (as trustee for the Noteholders) to pursue a remedy under Sections 6.02 or 6.03.  Specifically, absent a bankruptcy, if an Event of Default "occurs and is continuing," Section 6.02 generally permits — but does not require — Wilmington Savings to accelerate the Notes and "declare the principal of and accrued interest on the Notes to be immediately due and payable."  (Indenture § 6.02(a); *see also id.* ("If a bankruptcy default occurs . . . the Notes then outstanding will become immediately due and payable without any declaration or other act . . . .")).  And under Section 6.03 — titled "Other Remedies" — Wilmington Savings may pursue "any available remedy by proceeding at law or in equity to collect the payment of principal of and interest on the Notes or to enforce the performance of any provision of the Notes or the Indenture."  (*Id.* § 6.03).  Finally, to the extent relevant here, the Indenture grants Cash America the option to "redeem" (that is, pay off) the Notes in advance of their due date (thus relieving Cash America of the restrictions contained in the Indenture), but only if the company pays an additional fee — commonly known as a prepayment fee, prepayment premium, or "make-whole" fee.  (*See id.* § 3.01).

On April 10, 2014, less than a year after issuing the Notes, Cash America issued a press release announcing that it was reviewing "potential strategic alternatives, including a tax-free spinoff, for the separation of its online lending business that comprises its e-commerce division, Enova International, Inc."  (Pl.'s 56.1 Statement ¶ 29).  In subsequent disclosures, the company revealed that its Board of Directors had approved a "spin-off" of Enova, pursuant to which

3

eighty percent of Enova common stock would be distributed to the Cash America's shareholders and Enova would become "an independent and separate publicly traded company." (*Id.* ¶¶ 31, 33). On October 22, 2014, one of the Noteholders, a hedge fund named River Birch Capital LLC, sent a letter to Cash America warning that the Enova spin-off would violate Section 5.01 of the Indenture. "We assume" the letter continued, "that the Company will not let an Event of Default occur and will honor its obligations to the Noteholders under the Indenture by simply redeeming the Notes and paying the Make-Whole Premium . . . . To the extent the Company chooses not to redeem the Notes, applicable case law in New York nevertheless requires the redemption of notes and payment of any 'make-whole' . . . ." (*Id.* ¶ 34-35; *see* Rieman Decl., Ex. 11). Previewing its position here, Cash America responded on November 3, 2014, by stating that the spin-off would not breach the Indenture and that, in any event, acceleration was the only remedy for a breach. (Rieman Decl., Ex. 12). On November 13, 2014, Cash America effectuated the spin-off by conveying eighty percent of Enova's outstanding shares of common stock to Cash America's shareholders. (Pl.'s 56.1 Statement ¶¶ 38-39; Def.'s 56.1 Statement ¶ 32). This suit followed on June 26, 2015. (Docket No. 1).

## LEGAL STANDARDS

Summary judgment is appropriate where the admissible evidence and pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam). A dispute over an issue of material fact qualifies as genuine if the "evidence is such that a reasonable jury could return a judgment for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). "In moving for summary judgment against a party who will bear the ultimate

burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)); *accord PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002). In ruling on a motion for summary judgment, a court must view all evidence "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

Where, as here, both sides move for summary judgment, "neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993). "[T]he court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* (quoting *Schwabenbauer v. Bd. of Educ. of Olean*, 667 F.2d 305, 314 (2d Cir. 1981)). To defeat a motion for summary judgment, the non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted).

"It is a well-established rule in this Circuit that the interpretation of [i]ndenture provisions is a matter of basic contract law." *Jamie Sec. Co. v. The Ltd., Inc.*, 880 F.2d 1572,

5

1576 (2d Cir. 1989) (brackets and internal quotation marks omitted)); *accord Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co.*, No. 15-2366-CV, 2016 WL 4895581, at *3 (2d Cir. Sept. 15, 2016) (per curiam).  Under New York's basic contract law, which applies here (*see* Indenture § 11.07), a court may grant summary judgment in a contract dispute "only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning."  *Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008); *see, e.g.*, *Postlewaite v. McGraw–Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005) (explaining that "when the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot be resolved on a motion for summary judgment").  A contract is ambiguous if its language is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement."  *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993).  Conversely, "a contract is unambiguous if the language it uses has a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion."  *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (citing *White v. Cont'l Cas. Co.*, 878 N.E.2d 1019, 1021 (N.Y. 2007)).  "Whether contract language is ambiguous is a question of law that is resolved by reference to the contract alone."  *O'Neil v. Ret. Plan for Salaried Emps. of RKO Gen., Inc.*, 37 F.3d 55, 58-59 (2d Cir. 1994) (internal quotation marks omitted).

## DISCUSSION

As noted, the parties dispute both whether Cash America breached the Indenture and, if so, what remedies are available to Wilmington Savings (and thus the Noteholders).  The Court begins with the threshold question of breach.  Concluding that the Indenture's plain language

prohibited the Enova spin-off and that the transaction thus constituted a breach of the Indenture, the Court then turns to the question of remedies.

## A.  Breach

The parties' dispute over whether the Enova spin-off constituted a breach of the Indenture turns on a single question: whether the transaction fell within the scope of the exception to prohibited transactions for transactions in which "the aggregate book value of the properties disposed of . . . does not exceed" ten percent of the company's "Consolidated Total Assets."  (Indenture § 5.01(2)(iii); *see* Docket No. 39 ("Pl.'s Reply") 3; Docket No. 43 ("Def.'s Reply") 3).  More specifically, the dispositive question is whether, for purposes of that provision, the "aggregate book value the properties disposed of" is equal to the book value of Enova's assets or equal to the book value of Enova's assets *minus* its liabilities.  (*See* Pl.'s Reply 3-8; Def.'s Reply 3-8).  Wilmington Savings argues it should be calculated by looking at assets alone, in which case the parties agree that the "aggregate book value" of the Enova shares exceeded the relevant threshold by several orders of magnitude and the transaction constituted a breach of the Indenture.  (*See* Pl.'s Mem. 11-12; Pl.'s Reply 3-8).  By contrast, Cash America contends that the "aggregate book value" of Enova's shares should be calculated by looking at assets minus liabilities, in which case the transaction would fall within the scope of the exception at issue and would not constitute a breach of the Indenture.  (*See* Docket No. 27 ("Def.'s Mem.") 11-13; Def.'s Reply 3-8).

Given the unambiguous terms of the Indenture, the Court agrees with Wilmington Savings, and thus concludes that Cash America breached the Indenture.  Indeed, that conclusion is compelled by the plain language of Section 5.01(7) of the Indenture, which provides that, "[f]or purposes of determining the book value of property constituting capital stock or similar

equity interests of a Subsidiary of the Company disposed of as provided in Section 5.01(2), such book value *shall be deemed to be the aggregate book value of all assets of the Subsidiary* that shall have issued such capital stock or similar equity interests."  (Indenture § 5.01(7)) (emphasis added).  By its terms, Section 5.01(7) values the "properties disposed of" here — namely, equity (*i.e.*, "capital stock or similar equity interests") — with reference to assets alone.  There is no mention of liabilities and no reference to *net* assets; and the words "shall be deemed to be" leave little or no room for interpretation, whatever "equity" might mean in other contexts or as a general matter.  *Cf. DiMaria v. Goor*, No. 09-CV-1011 (JG) (RML), 2012 WL 541425, at *4 (E.D.N.Y. Feb. 21, 2012) ("GAAP defines . . . 'net worth' as assets minus liabilities, which is also referred to as 'equity.'").  That interpretation is bolstered by the fact that the relevant exception calls for comparison of the figure to a benchmark comprised solely of assets — namely, Cash America's "Consolidated Total *Assets*."  (Indenture § 5.01(2)(iii)) (emphasis added).  Accordingly, "the book value of" the Enova shares for purposes of Section 5.01(2)(iii) is based solely on the "book value of all assets" of Enova.  (*Id.* § 5.01(7)).  There is no dispute that eighty percent of that figure far exceeds the threshold for the one and only exception that could apply in this case.  (Def.'s Mem. 13).  As Wilmington Savings puts it, "[t]hat is really the end of the dispute." (Pl.'s Reply 5).

Cash America's arguments to the contrary are unpersuasive.  It argues principally that, as a matter of New York law, the term "book value" always entails subtracting liabilities from assets.  (*See* Def.'s Mem. 13; Def.'s Reply 4-5).  Relatedly, it contends that Section 5.10(7) incorporates that meaning of "book value" in deeming equity interest to be equal to "the

aggregate book value of all assets of the Subsidiary." (*See* Def.'s Reply 5-6).[1]  In its discussion

of New York law, Cash America cites several cases (Def.'s Mem. 13; Def.'s Reply 4), but none

of those cases purports to define "book value" such that, standing on its own, it is "an

unambiguous term under New York law" (Def.'s Reply 7).  Indeed, several cases involved the

language of specific statutes or specific contracts not present here.  *See, e.g.*, *Borkan v. Quest

Med., Inc.*, No. 95-CV-10381 (MBM), 1996 WL 445361, at *1 (S.D.N.Y. Aug. 7, 1996)

(referencing the contractual term "'Book Value'"); *In re Estate of Reichenbaum*, 214 A.D.2d 48,

49-51 (N.Y. App. Div. 1995) (meaning of "book value" in Business Corporation Law § 1510(a)).

Cash America's strongest support lies in two stray sentences of dicta — *see People ex rel.

Knickerbocker Fire Ins. Co. v. Coleman*, 14 N.E. 431, 432 (N.Y. 1887) ("'[B]ook value,' . . . is

reached by estimating all the assets as they appear upon the corporate books, and deducting all

the liabilities . . . ."); *Reichenbaum*, 214 A.D.2d at 51 (stating that "book value is generally

determined by deducting liabilities from the total assets as they appear on the corporate books")

— that, taken out of context, seem to support its argument.  But when interpreting case law or

contracts, "context matters," *Rothstein v. Balboa Ins. Co.*, 794 F.3d 256, 265 (2d Cir. 2015), and

the context of those cases differs materially from the context here.  Specifically, the

*Knickerbocker Fire* and *Reichenbaum* Courts — like the other courts cited by Cash America[2] —

---

[1]    Cash America makes the latter argument in its reply brief; indeed, in its opening brief, Cash America all but ignores the language of Section 5.10(7) and focuses almost entirely on New York common law.  (*See* Def.'s Mem. 12-13).  The Court need not decide whether the argument was waived given its conclusions below.

[2]    *See also Borkan*, 1996 WL 445361, at *1 (discussing the "'Book Value'" of a company (*i.e.*, all its stock) at different dates); *Matsuo v. Matsuo*, 124 A.D.2d 864, 865 (N.Y. App. Div. 1986) (discussing "the 'book value' of [a] professional corporation"); *Baron v. Royal Paper Corp.*, 36 A.D.2d 112, 115 (N.Y. App. Div. 1971) (petitioner, whose "stock was to be book value," had right to inspect books and records of corporation to confirm validity of corporation's

used the phrase "book value" only in reference to *equity* or a *company*.  *See Knickerbocker*, 14 N.E. at 432 (discussing "the actual value of the capital stock of a corporation"); *Reichenbaum*, 214 A.D.2d at 49 (discussing "the value of the decedent's shares").  They did not purport to define the term "book value" for all purposes, and their interpretations shed no light on the meaning of the term as used in reference to "assets" in Sections 5.01(2)(iii) and 5.01(7) of the Indenture.

In fact, it is far from clear what measuring assets minus liabilities could even mean as applied to assets alone.  Assets are, well, just assets; unlike companies, they themselves do not have liabilities.  *Cf. In re Nirvana Rest. Inc.*, 337 B.R. 495, 506-07 (Bankr. S.D.N.Y. 2006) (discussing the "book values of . . . three assets" without any reference to Cash America's purported meaning of "book value"); *In re Enron Corp.*, 349 B.R. 96, 99, n.1 (Bankr. S.D.N.Y. 2006) (referring to book value "in the accounting sense" as meaning the "value at which an asset is carried on a balance sheet." (quoting Black's Law Dictionary 177 (7th ed. 1999)).  Thus, to the extent the phrase "book value" has any fixed meaning — that is, without regard for context — it would appear to involve an assessment of value based on a *recorded* figure (as Cash America's own cases themselves suggest).  *See Reichenbaum*, 214 A.D.2d at 50-51 (contrasting "book value" with "fair value"); *Matsuo*, 124 A.D.2d at 865 (holding that the trial court had erred by "measur[ing] the value of defendant's medical practice according to the 'book value' of the professional corporation," which "was derived from the corporate balance sheet," and remanding to consider "the value of defendant's medical practice based on the theory of capitalization of earnings").  One could, of course, assess value through other methods — for example, by using

---

accounting); *Lane v. Barnard*, 185 A.D. 754, 756 (N.Y. App. Div. 1919) (discussing the book value of common stock "as shown by the books and records of the company at that time").

market value metrics — but doing so often involves complications beyond simply consulting a
ledger.  *Cf. CSX Transp., Inc. v. Georgia State Bd. of Equalization*, 552 U.S. 9, 17, (2007)
(stating, with respect to real estate, that "the calculation of true market value is an applied
science, even a craft  . . . based on careful scrutiny of all the data available"); *Henry v.
Champlain Enters., Inc.*, 445 F.3d 610, 619 (2d Cir. 2006) ("There is no universally infallible
index of fair market value.  There may be a range of prices with reasonable claims to being fair
market value.").

        In short, the cases cited by Cash America are inapplicable here, and there are no grounds,
under New York law or otherwise, to interpret Section 5.01(7)'s phrase "book value of all
assets" to actually mean the "book value of all assets *minus liabilities*."  Put simply, Cash
America seeks to rewrite the contract to say something other than what it says.  Far from
compelling that outcome, New York law expressly prohibits it.  That is, this Court may not "by
construction add or excise terms, nor distort the meaning of those used and thereby make a new
contract for the parties under the guise of interpreting the writing."  *Riverside S. Planning Corp.
v. CRP/Extell Riverside, L.P.*, 892 N.Y.S.2d 303, 307 (N.Y. 2009); *see also Grant & Eisenhofer,
P.A. v. Bernstein Liebhard, LLP*, No. 14-CV-9839 (JMF), 2016 WL 4098616, at *4 (S.D.N.Y.
July 28, 2016) (noting that "the Court's 'fundamental objective is to determine the intent of the
contracting parties *as derived from the language employed in the contract*'" (quoting *Consol.
Edison, Inc. v. Ne. Utils.*, 426 F.3d 524, 527 (2d Cir. 2005)).  It follows that the Enova spin-off
did not fall within the exception established by Section 5.01(2)(iii), and thus constituted a breach
of Section 5.01 and a continuing "Event of Default" within the meaning of Section 6.01(3).[3]

---

[3]         In light of the foregoing, the Court need not, and does not, reach Wilmington Savings's
other arguments on the question of whether Cash America breached the Indenture, including one
argument that is based on expert opinion.  (*See* Pl.'s Reply 6-8).  By extension, the Court need

**B. Remedy**

The Court turns, then, to the question of Wilmington Savings's remedy — specifically, whether the Noteholders may recoup a "make-whole" fee. That question turns on the interplay between the Indenture's prepayment and acceleration clauses. First, Section 3.01 allows Cash America to redeem the Notes in advance of their maturity date by paying a premium, commonly known as a "make-whole" amount. Prepayment clauses are common features of indentures, as "[i]t has long been settled in New York that a borrower does not have a right to prepay an instrument in the absence of a prepayment clause." *In re Solutia Inc.*, 379 B.R. 473, 487-88 (Bankr. S.D.N.Y. 2007). And it is common for them to include a "prepayment fee" or "make-whole" premium, as Section 3.01 does, because the lender had originally "bargained for a stream of income over a fixed period of time." *Id.* at 488; *see Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1053 (2d Cir. 1982) ("The purpose of a redemption premium is to put a price upon the voluntary satisfaction of a debt before the date of maturity."); *In re MPM Silicones, LLC*, No. 14-22503-RDD, 2014 WL 4436335, at *12-13 (Bankr. S.D.N.Y. Sept. 9, 2014) ("It is well settled under New York law . . . that the parties to a loan agreement, indenture or note can amend the general rule under New York law of 'perfect tender' to provide for a specific right on behalf of the borrower or issuer to prepay the debt in return for agreed consideration that compensates the lender for the cessation of the stream of interest payments running to the original maturity date of the loan."), *aff'd*, 531 B.R. 321 (S.D.N.Y. 2015); Scott K. Charles & Emil A. Kleinhaus, *Prepayment Clauses in Bankruptcy*, 15 Am. Bankr. Inst. L. Rev. 537, 538 (2007) ("[W]hen faced with a prepayment fee, the borrower will repay its debt only

---

not, and does not, resolve the parties' dispute over whether reliance on expert opinion here would be proper. (*Compare* Pl.'s Mem. 5, *with* Def.'s Reply 7-8).

when the benefits from prepayment are greater than the fee.  Prepayment clauses, in sum, allow a

lender to negotiate for yield protection and a borrower to negotiate for freedom of action.").

Pursuant to Section 3.01, Cash America could be freed from the Indenture's obligations and

restrictions by redeeming the Notes prior to their maturity — *i.e.*, prepaying, with a premium.

Second, Section 6.02 generally permits, but does not require, Wilmington Savings to

"accelerate" the maturity of the Notes in the event of a default by Cash America (except if the

default is caused by bankruptcy).  Such acceleration clauses are, like prepayment clauses,

standard provisions of indentures, and New York law governing the interaction between the two

is — at least in some respects — well established.  In particular, once a debt is accelerated,

lenders may not collect a prepayment or make-whole fee (absent provision to the contrary in the

indenture, of course).  "The rationale for this rule is logical and clear: by accelerating the debt,

the lender advances the maturity of the loan and any subsequent payment by definition cannot be

a prepayment."  *MPM Silicones*, 2014 WL 4436335, at \*12; *accord In re LHD Realty Corp.*, 726

F.2d 327, 330-31 (7th Cir. 1984) ("[A]cceleration, by definition, advances the maturity date of

the debt so that payment thereafter is not prepayment but instead is payment made after

maturity.").  Because of that rule, lenders sometimes challenge the automatic acceleration of debt

— most often, it seems, where the default arises from bankruptcy (triggering, by contract or by

law, automatic acceleration) — in pursuit of a prepayment fee.  *See, e.g.*, *In re AMR Corp.*, 730

F.3d 88, 98 (2d Cir. 2013) ("U.S. Bank . . . maintains that to the extent acceleration occurred

automatically under Indenture provisions by virtue of [the borrower's] bankruptcy filing, such

provisions are unenforceable . . . .  Alternatively, U.S. Bank proposes that to the extent the Notes

were accelerated, the § 1110(a) election decelerated them, as confirmed by [the borrower's]

payment of regularly scheduled principal and interest.  Finally, U.S. Bank contends that it should be permitted to rescind any such acceleration . . . .").

Defaults unrelated to bankruptcy appear to be less common, but the Second Circuit confronted one in *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039 (2d Cir. 1982).  The dispute in that case concerned debt instruments issued by UV Industries, Inc. ("UV") pursuant to several indentures.  *See id.* at 1042.  Each indenture "contain[ed] clauses permitting redemption by UV prior to the maturity date, in exchange for payment of a fixed redemption price (which includes principal, accrued interest and a redemption premium) and clauses allowing acceleration as a non-exclusive remedy in case of a default."  *Id.* at 1042-43.  In addition, each indenture "contain[ed] a 'successor obligor' provision allowing UV to assign its debt to a corporate successor which purchases 'all or substantially all' of UV's assets."  *Id.* at 1044-45.  If, following such a sale or purchase, the debt was not assigned, the indentures required UV to pay off the debt.  *Id.* at 1045.  In 1979, UV began executing a "predetermined plan of piecemeal liquidation," *id.* at 1049, which concluded with Sharon Steel's purchase of UV's remaining assets and attempt to "formalize its position as [UV's] successor obligor" under the indentures, *id.* at 1046.  Litigation ensued; following a directed verdict in the district court, the Second Circuit agreed with the noteholders (and the district court) that the successor obligor clauses did not allow such a maneuver and, thus, that the indentures had been breached.  *See id.* at 1047-1053.  More significant for present purposes, with respect to whether the noteholders were limited to acceleration as a remedy or could demand the redemption premium, the Second Circuit held that where "acceleration provisions of the indentures are explicitly permissive and not exclusive of other remedies" and the debtor does not "find[] itself unable to make required payments," there is "no bar . . . to [the lender] seeking specific performance of the redemption

provisions where the debtor causes the debentures to become due and payable by its voluntary actions." *Id.* at 1053. In such circumstances, "the redemption premium must be paid." *Id.*

The Court agrees with Wilmington Savings that *Sharon Steel* is controlling here. As in *Sharon Steel*, the Indenture has both a redemption clause that requires payment of a make-whole premium as well as an acceleration clause that is "explicitly permissive and not exclusive of other remedies." *Id.* (*See* Indenture § 6.03 ("Other Remedies"); *see also id.* § 6.13 ("No right or remedy conferred or reserved to the Trustee or to the Holders under this Indenture is intended to be exclusive of any other right or remedy . . . .")). And Cash America's default, like the default in *Sharon Steel*, was not due to bankruptcy, but to the company's "voluntary actions," 691 F.2d at 1053 — namely, the Enova spin-off. Thus, Wilmington Savings may seek, pursuant to Section 6.03 of the Indenture, "to enforce the performance of a[] provision of the . . . Indenture" — namely, the prepayment provision. In light of the Indenture's permissive, non-exclusive acceleration clause and Cash America's voluntary breach, there is "no bar" to that relief. *Id.*. If anything, Wilmington Savings's claim to specific performance is even stronger than the claim of the noteholders in *Sharon Steel*, as the Indenture here expressly grants Wilmington Savings the right to pursue such a remedy. Accordingly, in this case, as in *Sharon Steel*, "the redemption premium must be paid." *Id.*

In arguing otherwise, Cash America offers a tortured reading of both the Indenture and *Sharon Steel*. With respect to the former, for example, Cash America argues that the Indenture "specifically identifies only one remedy for an Event of Default: acceleration, not redemption." (Def.'s Reply 8). But the Indenture provision immediately following the acceleration clause, titled "Other Remedies," explicitly affords the Trustee "any available remedy by proceeding at law or in equity . . . *to enforce the performance* of any provision of the Notes or the Indenture."

15

(Indenture § 6.03 (emphasis added)).  In other words, the Indenture gives the Trustee broad discretion to seek "any available remedy" and *specifically* authorizes the Trustee to seek specific performance.  Cash America also emphasizes that the prepayment clause states only that Cash America "may" redeem the notes ahead of time.  (Def.'s Reply 8).  But the *option* to pay in advance is, by definition, what a prepayment clause affords a borrower.  And, more to the point, the borrower in *Sharon Steel* had the same option and that was obviously no barrier to specific performance.  *See* 691 F.2d at 1042 ("Each instrument contains clauses *permitting* redemption by [the borrower] prior to the maturity date, in exchange for payment of a fixed redemption price . . . ." (emphasis added)).  Indeed, in *Sharon Steel* the Second Circuit reversed the district judge's adoption of the very position Cash America presses here.  *See id.* at 1053 ("Judge Werker held that the redemption premium under the indentures need not be paid by UV.  His reasoning was essentially that UV defaulted under the indenture agreement and that the default provisions provide for acceleration rather than a redemption premium.  We do not agree.").

With respect to *Sharon Steel*, Cash America contends first that the Court ordered specific performance of the prepayment clause only because the debtor, which was incorporated in Maine and was implementing a liquidation plan, had an "obligation under Maine law to redeem the notes before liquidating."  (Def.'s Reply 8).  "[T]he *Sharon Steel* court," Cash America explains, "held that an event of default is '*no bar* . . . to the Indenture Trustees seeking specific performance of the redemption provisions where the debtor *causes the debentures to become due and payable* by its voluntary actions' prior to the default.  In such circumstances, where notes are *already* 'due and payable' due to the debtor's actions and the debtor *also* subsequently defaults, a trustee or noteholder can seek redemption (as it previously could have) instead of acceleration (the remedy made available by the default)."  (Def. Br. 16-17 (quoting 691 F.2d at 1053)

(emphasis in Cash America's brief)).  But while Maine law's requirement that a corporation pay all of its obligations before liquidating *is* mentioned in the background section of the Second Circuit's opinion, 691 F.2d at 1046, it is mentioned only in passing and only to explain why a fund was created (the details of which are irrelevant here); it plays no part in the Court's discussion of specific performance, *see id.* at 1053.  To the contrary, the Court simply observed that breach of the indentures "stemmed from" the debtor's "voluntary liquidation" coupled with its rejected interpretation of the indentures, *id.* — just as breach of the Indenture here stems from Cash America's voluntary spin-off coupled with its rejected interpretation of the Indenture.

Cash America is arguably on firmer ground in contending (somewhat inconsistently) that *Sharon Steel* "requires bad-faith conduct," if only because it can point to *dicta* suggesting as much in subsequent cases.  (*See* Def.'s Reply 13-14 (citing cases)).  *See MPM Silicones*, 2014 WL 4436335, at *13 (describing *Sharon Steel* as holding that, "when [a] debtor intentionally defaults," as a "tactical device," "in order to trigger acceleration and evade the prepayment premium or make-whole, the debtor will remain liable for the make-whole notwithstanding acceleration of the debt"); *In re Granite Broadcasting Corp.*, 369 B.R. 120, 144 (Bankr. S.D.N.Y. 2007) (describing *Sharon Steel* as applicable to "an intentional default by a borrower, with the intention of forcing an acceleration"); Charles & Kleinhaus, *supra*, at 547 (stating that *Sharon Steel* concerns when "a borrower purposely defaults under a loan agreement in order to avoid the effect of the agreement's prepayment clause" (emphasis omitted)).  But that requirement finds no support in *Sharon Steel* itself; indeed, the Second Circuit did not purport to make, and as an appellate court would have been in no position to make, a factual finding on an

issue the district court did not have occasion even to reach.[4]   Instead, the Court's analysis turned on the distinction between defaults arising from "voluntary" actions (*e.g.*, liquidations or spin-offs) versus involuntary actions (*e.g.*, bankruptcies).  *See* 691 F.2d at 1053.  And even if this Court were writing on a blank slate, it would be reluctant to introduce the issue of subjective intent into the analysis, given the inherent difficulty of deciphering the "intent" of a company and the fact that contract remedies are generally designed to compensate the non-breaching party, not punish the breaching party for bad intent.  *See, e.g.*, *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 643 N.E.2d 504, 507 (N.Y. 1994) (stating, as a general matter, that the measure of contract damages is not affected by whether the breaching party deliberately or inadvertently failed to perform its contractual obligations).

Finally, Cash America's argument that requiring it to pay a redemption premium pursuant to *Sharon Steel* is somehow inequitable, will effectively destroy the use of acceleration clauses, and "upend the nation's debt markets" is overblown.  (Def.'s Reply 15; *see also* Def.'s Mem. 20-21).  Indeed, if anything, Cash America's position is the inequitable one: It seeks to place itself in a better position by *breaching* the Indenture than it would have occupied had it honored the parties' contract.  *See Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 886 N.E.2d 127, 132 (N.Y. 2008) (noting that damages for breach of contract seek to place the non-breaching party "in as good a position as it would have been in had the contract been

---

[4]     Nor is it obvious that the Second Circuit could have made a finding of bad faith on the facts of the case.  For one thing, the debtor's successor-in-interest indicated that it was prepared to honor the indentures.  *See* 691 F.2d at 1046-47 (describing Sharon Steel's "attempt to formalize its position as successor obligor" through the delivery of executed supplemental indentures to the trustees).  For another, the debtor had a non-frivolous argument based on the indentures' successor obligor clauses that it did not breach the indentures at all.  The Second Circuit rejected that argument, but only after a lengthy analysis of the issue (in stark contrast to the Court's fairly peremptory discussion of the redemption premium issue).

performed"). Cash America had notice prior to the Enova spin-off that some Noteholders believed the transaction would constitute a breach of the Indenture, and it could have at that time paid the redemption fee or negotiated a waiver. *Cf. Chesapeake Energy*, 2016 WL 4895581, at *4 ("Chesapeake knew that this had been BNY Mellon's litigation position since the outset and had been confronted with the possibility that a holding by this Court . . . could trigger Chesapeake's obligation to pay the Make-Whole Price . . . ."). Moreover, when negotiating the Indenture itself, Cash America could have foreclosed the possibility of *Sharon Steel* applying to a voluntary breach of the Indenture. *See Analytical Surveys, Inc. v. Tonga Partners, L.P.,* 684 F.3d 36, 44 (2d Cir. 2012) ("Under New York law, the parties to a loan agreement are free to include provisions directing what will happen in the event of default of the debt, supplying specific terms that supersede other provisions in the contract if those events occur." (internal quotation marks and alterations omitted)). For example, Cash America had — as future parties have — "the ability . . . to draft acceleration provisions that would be self-operative." *In re AMR Corp.*, 730 F.3d at 100; *see, e.g.*, *In re Solutia,* 379 B.R. at 484 (noting that the automatic acceleration provision in a note indenture was "the result that [noteholders] bargained for"); *In re MPM Silicones, LLC*, 531 B.R. 321, 338 (S.D.N.Y. 2015) ("Here, the Senior Lien Appellants bargained for the [automatic] acceleration of debt in the event of a default, and must live with the consequences of their bargain."). Put simply, Cash America's attempt to reap the benefit of something it did not bargain for is rejected.

## CONCLUSION

In sum, the Court concludes that, by disposing of eighty percent of the shares of a valuable wholly owned subsidiary, Cash America breached the Indenture. Notably, the transaction disposed of significant property (and for no consideration), reduced Cash America's

future expected income, and materially changed its financial condition.  As a result, the

Noteholders were left holding Notes that, as an economic and legal matter, did not conform to

the protections afforded by the Indenture.  That constituted a breach of the Indenture and, under

the Second Circuit's binding decision in *Sharon Steel*, the Noteholders are entitled to payment of

the make-whole premium.

      Accordingly, Wilmington Savings's motion for summary judgment is granted and Cash

America's motion for summary judgment is denied.  The only open issue is the amount owed.  In

addition to the redemption price, Wilmington Savings requests "an award of all fees, costs, and

expenses incurred by the Trustee in enforcing the rights of the Noteholders pursuant to Section

6.12 of the Indenture."  (Pl.'s Mem. 19).  The Court directs the parties to meet and confer

regarding that request as well as the calculation of the redemption price.  (*See id*. at 18 ("If the

Court rules that the Trustee is entitled to payment of the redemption price, the Trustee will

attempt to agree with Cash America on the precise amount owed under Section 3.01.").)  No

later than **thirty days from the date of this Opinion and Order**, the parties shall advise the

Court by letter if they have reached agreement on those issues and, if not, propose a means (and

schedule) to resolve any remaining disputes.

      The Clerk of Court is directed to terminate Docket Nos. 22 and 26.


      SO ORDERED.

Date:  September 19, 2016
       New York, New York

                                     JESSE M. FURMAN
                                 United States District Judge